Nicholas O. Kennedy (State Bar No. 280504)
nicholas.kennedy@bakermckenzie.com
**BAKER & McKENZIE LLP**
1900 North Pearl Street, Suite 1500
Dallas, TX 75201
Telephone:    214 978 3000
Facsimile:    214 978 3099

Armen Manasserian (State Bar No. 288199)
armen@ml-apc.com
**MANASSERIAN LAW, APC**
35 Hugus Aly, Suite 210
Pasadena, CA 91103
Telephone:    626 469 0500
Facsimile:    626 469 0510

Attorneys for Plaintiffs,
Coronitas Holdings, LLC, and
Wolverine Endeavors VIII, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| CORONITAS HOLDINGS, LLC, a Wyoming limited liability company; and WOLVERINE ENDEAVORS VIII, LLC, a California limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>1023 MONTEREY INVESTORS LLC, a California limited liability company; 1035 MONTEREY INVESTORS LLC, a California limited liability company; A.J. SPURS, INC., BUELLTON, a California corporation; ADDIE STREET LAND GROUP LP, a California limited partnership; AKRO REAL ESTATE PARTNERS LLC, a California limited liability company; APPLE FARM COLLECTIONS-SLO, INC., a California corporation; BLACK CHAPS LLC, a California limited liability company; BOUTIQUE HOTEL COLLECTION, INC., a California corporation; DISTINCTIVE RESORTS, INC., a California corporation; CLIFFS RESORT LLC, a California limited liability company; FERNWOOD RESORT, LLC, a California limited liability company; HIGUERA BREW LLC, a California limited liability company; JGK CONSTRUCTION LLC, a California limited liability company; | Case No. _____<br><br>Complaint Filed:<br><br><br>**COMPLAINT**<br><br>**[CIVIL RICO LIABILITY]**<br><br>**(Civil RICO Liability under 18 U.S.C. § 1962(c), § 1962(d) and § 1964(c))**<br><br>**DEMAND FOR JURY TRIAL** |

CAROLE D. KING, an individual; CAROLE D. KING, as Trustee of the JOHN AND CAROLE KING FAMILY TRUST, DATED APRIL 20, 2006; JOHN G. KING, an individual; JOHN G. KING, as Trustee of the JG KING LIVING TRUST, DATED FEBRUARY 25, 2021; JOHN E. KING, an individual; JOHN E. KING, as Trustee of the JOHN AND CAROLE KING FAMILY TRUST, DATED APRIL 20, 2006; LANA LUCAS, an individual; LOS LOBOS INVESTMENTS LLC, a California limited liability company; PAUL G. METCHIK, an individual; MISSION GROVE ASSOCIATES, a California general partnership; MONTALBAN STREET GROUP, a California general partnership; MICHAEL NELSON, an individual; ORKA REAL ESTATE PARTNERS LLC, a California limited liability company; ROBIN L. ROSSI, an individual; ROBIN L. ROSSI as Trustee of THE ROBIN L. ROSSI LIVING TRUST U/D/T OCTOBER 19, 1990 a/k/a ROBIN L. ROSSI LIVING TRUST; SPANISH VINEYARDS LLC, a California limited liability company; SYCAMORE MINERAL SPRINGS LLC, a California limited liability company; THE SEAVENTURE RESORT, LLC, a California limited liability company; THE VINEYARDS AT SPANISH SPRINGS, LLC, a California limited liability company; and DOES 1-100, inclusive,

Defendants.

2

Case No.
COMPLAINT

## **INTRODUCTION**

1.      This action arises from an asset protection scheme so extreme that it may only be described as a massive fraud upon the courts and the legitimate creditors of a prominent San Luis Obispo family. The family bought two judgments against itself, became its own sham "creditor," and uses that position to unlawfully control and shield millions of dollars in assets from lawful collection.

2.      Defendant John E. King ("**John**") is a real estate developer and hotelier who has amassed a substantial portfolio of properties in San Luis Obispo County and beyond. His road to success was winding, and like many developers, he incurred substantial debts along the way. Many were paid. Others were not. And John will stop at nothing to shield his assets from those unpaid debts.

3.      To accomplish this, John enlisted a syndicate of confidants – including his wife Carole D. King ("**Carole**," and together with John, the "**Debtors**"); their son John G. King ("**JG**" and collectively with them, the "**King Family**"); his business partner Robin L. Rossi ("**Rossi**"); his attorney Paul G. Metchik ("**Metchik**"); and a web of shell and insider-controlled companies. Together, they have unleashed controlled chaos over King Family assets. To be sure, this chaos is not random or haphazard. It is a carefully orchestrated plan to avoid paying the many millions in judgments against the Debtors that John deems "unfair." As he testified under oath, John does not intend to ever pay these judgments.[1]

4.      For more than a decade, this syndicate, including the King Family, Rossi, Metchik, and entities they have created and/or controlled (collectively, the "**Enterprise**") has acted in concert – lying, concealing, perjuring, falsifying records, and manipulating courts – to achieve a single goal: keeping the money in the family and protecting King Family assets, at all costs, from legitimate creditors. The co-conspirators within the Enterprise have even used legal instruments and proceedings

---

[1] Feb. 25, 2022, Debtor Exam at 258:20-28. A true and correct copy of relevant excerpts is attached as **Exhibit 1**.

(e.g., foreclosure sales, court orders, and transfers of title) for the improper purpose of stealing, hiding, and insulating assets. In this very Court, the Enterprise has fabricated insider liens, issued sham levies, and executed fake foreclosures against itself to keep the money "in the family."

5.      Plaintiffs have suffered greatly as a result of the Enterprise's conduct. Plaintiffs hold approximately $20 million in judgments against the Debtors. They have sought to collect for years but have been stymied by a complex scheme carried out through extensive wire fraud, mail fraud, and obstruction of justice by the Enterprise.

6.      At its most basic level, the scheme centers on members of the Enterprise acting as sham "creditors" of the Debtors. Through this arrangement, the King Family is able to transfer assets of the Debtors to other members of the Enterprise, including two limited liability companies created precisely for this purpose – ORKA Real Estate Partners, LLC ("**ORKA**") and AKRO Real Estate Partners, LLC ("**AKRO**"), entities wholly owned and controlled by JG and Rossi.

7.      As will be detailed below, the scheme began with the King Family's settlement of two judgments, totaling over $16 million, entered in favor of Textron Financial Corporation ("**Textron**") and against the Debtors. Under the terms of a satisfaction agreement (the "**Textron Satisfaction Agreement**"), the Debtors agreed to pay Textron $4 million in installments over a ten-year period and pledged their assets as security for the debt owed to Textron. Textron agreed to terminate both judgments and all liens upon its receipt of the $4 million.

8.      By 2015, the King Family had paid $3.4 million in installments to Textron. In January 2016, through ORKA, the King Family paid the remaining $600,000 (the "**Textron Satisfaction Amount**") as a lump sum to Textron. Thus, the matter should have ended there, as by January 2016 the money the King Family owed to Textron was paid and its liens should have been extinguished. However, rather than allowing the judgments to be satisfied and the liens against the Debtors' assets to be extinguished by

that final $600,000 payment, the Enterprise had the judgments assigned to ORKA, who then weaponized them against legitimate creditors, including Plaintiffs. As assignee to Textron, ORKA became the creditor under the judgments, the Satisfaction Agreement, the recorded judgment liens attached to the Debtors' real property, and the charging and assignment orders entered by the court against the Debtors' interests in two dozen business entities. From a practical standpoint, JG now controlled the senior-most judgments against his parents and, by his own admission, still maintains complete control and domination over the assets that any legitimate creditor would pursue for recovery.

9.     By the time the King Family was ready to make the final $600,000 payment to Textron under the Satisfaction Agreement, millions of dollars in new judgments had been entered against them. Those new creditors, holding junior liens, were effectively blocked by the senior Textron Judgments – which, on paper, still appeared to total nearly $16 million. If the King Family had satisfied Textron, those junior creditors would have immediately begun enforcement. Facing that risk, John told JG and his longtime associate, Rossi, that "if they wanted to protect their interest in what they had, they better check and get involved in this thing . . . they better find out and see what they can do to help themselves." Acting on that advice, Rossi and JG formed ORKA. Rather than paying off Textron directly, the King Family redirected its final $600,000 payment into ORKA to capitalize the entity. ORKA then used those funds to "purchase" the Textron Judgments. In other words, ORKA, the entity created by and for the King Family, now held the rights to the Textron Judgments owed by the King Family, thus beginning the family's insider-controlled self-lien scheme. Effectively, for $4 million, the King Family purchased a fraudulent shield it could use, in perpetuity, against any creditor to which it owed money. Indeed, John explained the scheme when assuring the president of Monterey County Bank ("**MCB**"), a financial institution with which he had a longstanding business relationship, that nothing would

3

change after his son took over his assets:[2]

> For tax reasons, etc., my attorneys advised that my son buy the [Textron Judgments], which he did, and used the credited amount to foreclose out my interests in Avila Hot Springs . . . From the bank's perspective, nothing will noticeably change . . . Incidentally, over the past 15 years, JG has purchased almost all of my wife's and my interest in our major assets.

10.    In that same email, John attached a copy of JG's personal financial statement demonstrating a net worth in excess of $270 million. A true and correct copy is attached hereto as **Exhibit 2**.

11.    Post-acquisition, acting on behalf of ORKA, Metchik misrepresented the judgment balances and obtained fraudulent writs of execution from this Court to "foreclose" on valuable real estate owned by the Debtors. By stating a grossly inflated balance of **$5,137,620.42** on the larger of the two judgments – which had a chilling effect on bidding – Metchik effectively ensured ORKA would emerge as the winning bidder at the public auctions held by the U.S. Marshal's Service. Indeed, through ORKA, the Enterprise acquired the historic Fremont Theater and adjacent commercial buildings in downtown San Luis Obispo for $6,000 in 2017. Metchik repeated the process in 2019, enabling ORKA to secure the Apple Farm Inn, a landmark known for its wine country hospitality, for another winning bid of $6,000. These values were severely depressed as a result of the insider transactions – had they been sold to satisfy a legitimate creditor, they would have sold for much more.

12.    On December 19, 2019, on behalf of ORKA, Metchik used the Court's electronic filing system ("**CM/ECF**") to renew both Textron Judgments for a combined total of **$6,307,796.76**, causing the Court to enter the renewals at the grossly inflated balances. The Court entered the renewals of both judgments on December 13, 2019, and January 8, 2020. This has enabled the Enterprise to block the enforcement efforts of all other creditors, under the guise of enforcing their "senior" judgments.

---

[2] A true and correct copy of this email, which was received on or about November 11, 2025 in response to a subpoena issued to Monterey County Bank is attached as **Exhibit 3**.

13.     On June 5, 2020, ORKA assigned both Textron judgments to AKRO by filing an Assignments of Judgment and Acknowledgments of Assignment of Judgment on December 22, 2020, and November 2, 2021, via CM/ECF.

14.     Carrying the torch of the Enterprise, AKRO proceeded to file unopposed motions for additional enforcement rights against the Debtors in this Court, without once apprising the Court that AKRO is an insider entity controlled by the King Family; that AKRO's counsel of record, Metchik, is also a lifelong and current business partner of John and Rossi; that Metchik is currently a business partner of John and JG; that AKRO and the King Family share an office and employees in San Luis Obispo; or any other material facts that any court would consider about the relationship between a purported judgment creditor and its purported judgment debtors. Most significantly, Metchik covered up the fact that the judgments at issue should have been deemed satisfied as a result of the $4 million in total payments the Debtors made under the Textron Satisfaction Agreement.

15.     Tellingly, neither John nor Carole have resisted AKRO's "collection" efforts one bit. The fraudulent scheme, initiated by John himself, has worked as designed. His companies continue to pay all his living expenses in flagrant disregard of charging and assignment orders entered by this Court against those companies; he has continued to grow his real estate empire unimpeded; and his assets are out of reach of his legitimate creditors.

16.     The Enterprise's conduct is precisely the type of organized, calculated enterprise that Congress sought to combat when it enacted the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"). *Oscar v. Univ. Students Co-Op Ass'n*, 965 F.2d 783, 786 (9th Cir. 1992).

17.     This case presents precisely the type of domestic judgment-evasion scheme that the Supreme Court held actionable under RICO in *Smagin*. *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023). There, as here, judgment debtors used United States legal

5

process, shell entities, and fraudulent filings to prevent a lawful judgment from being collected. Plaintiffs suffered domestic injury to property when Defendants' conduct blocked execution on U.S. judgments and diverted U.S. assets in California to insider accounts. Plaintiffs thus bring this action under 18 U.S.C. §§ 1962(c) and (d) to recover treble damages, attorneys' fees and costs, and to put an end to the continuing racketeering enterprise that has defrauded them of more than $20 million.

## PARTIES

### A.    Plaintiffs

18.    The following Plaintiffs are judgment creditors of the Debtors and victims of the racketeering enterprise described below.

19.    Plaintiff Coronitas Holdings, LLC ("**Coronitas**") is a Wyoming limited liability company with its principal place of business in Sheridan County, Wyoming. Coronitas is the assignee of a judgment entered on September 14, 2017 in the Superior Court of California for the County of San Luis Obispo ("**San Luis Obispo Superior Court**"), *Ins. Co. of the West vs. Spanish Springs LLC, et al.*, Case No. 16CV0058, in favor of Insurance Company of the West ("**ICW**") against the Debtors and Spanish Springs, LLC, in the amount of $5,842,224.68, plus interest and costs (the "**ICW Judgment**"). The ICW Judgment was renewed on September 10, 2024, in the corrected amount of $9,930,182.62, as reflected in an order entered by the San Luis Obispo Superior Court on November 6, 2025. The ICW Judgment was assigned to Coronitas on April 30, 2025. With post-judgment interest, this judgment is now worth more than $10 million. It remains unsatisfied. A true and correct copy of the ICW Judgment is attached hereto as **Exhibit 4.**

20.    Plaintiff Wolverine Endeavors VIII, LLC ("**Wolverine**") is a California limited liability company with its principal place of business in San Diego County, California. Wolverine is the assignee of a judgment entered on September 14, 2011 in the Superior Court of the State of California for the County of San Francisco ("**San**

6

**Francisco Superior Court**"), Case No. CGC-10-505989 captioned *East West Bank vs. John E. King, et al.*, against the Debtors, in favor of EWB in the amount of **$5,434,547.68**, plus interest, attorneys' fees and costs (the "**EWB Judgment**"). This EWB Judgment was assigned to Wolverine on May 17, 2021. After assignment, it was renewed by Wolverine on June 21, 2021, for a total of **$7,077,693.78**, including accrued interest. With post-judgment interest, costs, and attorneys' fees, this judgment is now worth more than $10 million. It remains unsatisfied. A true and correct copy of the EWB Judgment is attached hereto as **Exhibit 5**.

### B.    Defendants – Members of the Enterprise

21.    The following Defendants, collectively referred to as the Enterprise, are the individuals and entities who acted in concert to conceal, transfer, and encumber the Debtors' assets. Each played a role in the scheme to hinder, delay and defraud legitimate creditors.

22.    Defendant 1023 Monterey Investors LLC ("**1023 Monterey**") is a California limited liability company with its principal place of business located at 750 Pismo Street, San Luis Obispo, California, in San Luis Obispo County.

23.    Defendant 1035 Monterey Investors LLC ("**1035 Monterey**") is a California limited liability company with its principal place of business located at 750 Pismo Street, San Luis Obispo, California, in San Luis Obispo County.

24.    Defendant A.J. Spurs, Inc., Buellton ("**A.J. Spurs**"), is a dissolved California corporation with its last known principal place of business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

25.    Defendant Addie Street Land Group LP ("**Addie Street**") is a California limited partnership with its principal place of business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

7

26.     Defendant AKRO Real Estate Partners LLC ("**AKRO**") is a California limited liability company with its principal place of business located at 750 Pismo Street, San Luis Obispo, California, in San Luis Obispo County.

27.     Defendant Apple Farm Collections-SLO, Inc. ("**Apple Farm**") is a California corporation with its principal place of business located at 750 Pismo Street, San Luis Obispo, California, in San Luis Obispo County.

28.     Defendant Black Chaps, LLC ("**Black Chaps**") is a California limited liability company with its principal place of business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

29.     Defendant Boutique Hotel Collection, Inc. ("**Boutique**") is a dissolved California corporation with its last known principal place of business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

30.     Defendant Distinctive Resorts, Inc. ("**DRI**") is a California corporation with its principal place of business in 285 Bridge Street, San Luis Obispo County, California.[3] In the alternative, Plaintiffs assert that DRI is the successor and/or alter ego to Boutique because DRI took over Boutique's role in the Enterprise after its formation.

31.     Defendant Cliffs Resort LLC ("**Cliffs**") is a California limited liability company with its principal place of business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

32.     Defendant Fernwood Resort, LLC ("**Fernwood**") is a California limited liability company with its principal place of business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

33.     Defendant Higuera Brew, LLC ("**Higuera**") is a California limited liability company with its principal place of business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

---

[3] DRI was formed as Coastal Hospitality Corp. on April 11, 2022, but later amended its name to Distinctive Resorts, Inc. on August 25, 2022.

8

Case No.
COMPLAINT

34.    Defendant JGK Construction LLC ("**JGK Construction**") is a California limited liability company with its principal place of business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

35.    Defendant John and Carole King Family Trust dated April 20, 2006 ("**John and Carole King Family Trust**") is a California trust organized and administered under the laws of the State of California, with its principal place of administration in San Luis Obispo County, California. John and Carole are the trustees of the trust.

36.    Defendant Carole D. King ("**Carole**") is an individual residing in San Luis Obispo County, California, and is also named herein in her capacity as trustee of the John and Carole King Family Trust, dated April 20, 2006.

37.    Defendant John E. King ("**John**") is an individual residing in San Luis Obispo County, California, and is also named herein in his capacity as trustee of the John and Carole King Family Trust, dated April 20, 2006.

38.    Defendant John G. King ("**JG**") is an individual residing in San Luis Obispo County, California.

39.    Defendant Lana Lucas ("**Lucas**") is an individual residing in San Luis Obispo County, California.

40.    Defendant Los Lobos Investments LLC ("**Los Lobos**") is a California limited liability company with its principal place of business located at 11010 Catalpa Court, Atascadero, California, in San Luis Obispo County.

41.    Defendant Paul G. Metchik ("**Metchik**") is an individual residing in San Luis Obispo County, California.

42.    Defendant Mission Grove Associates ("**Mission Grove**") is a California general partnership with its principal place of business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

9

43.    Defendant Montalban Street Group ("**Montalban**") is a California general partnership with its principal place of business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

44.    Defendant Michael Nelson ("**Nelson**") is an individual residing in Flathead County, Montana, who formerly resided in San Luis Obispo County, California.

45.    Defendant ORKA Real Estate Partners LLC ("**ORKA**") is a California limited liability company with its principal place of business located at 750 Pismo Street, San Luis Obispo, California, in San Luis Obispo County.

46.    Defendant Robin L. Rossi ("**Rossi**") is an individual residing in San Luis Obispo County, California, and is also named herein in his capacity as trustee of the Robin L. Rossi Living Trust U/D/T October 19, 1990 a/k/a Robin L. Rossi Living Trust.

47.    Defendant Robin L. Rossi Living Trust U/D/T October 19, 1990 a/k/a Robin L. Rossi Living Trust ("**Robin L. Rossi Living Trust**") is, upon information and belief, a trust organized and administered under the laws of the State of California, with its principal place of administration in San Luis Obispo County, California. Upon information and belief, the trustee of the trust is Robin L. Rossi.

48.    Defendant Spanish Vineyards LLC ("**Spanish Vineyards**") is a California limited liability company with its principal place of business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

49.    Defendant Sycamore Mineral Springs LLC ("**Sycamore**") is a California limited liability company with its principal place of business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

50.    Defendant The SeaVenture Resort, LLC ("**SeaVenture**") is a California limited liability company with its principal place of business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

51.    Defendant The Vineyards at Spanish Springs, LLC ("**The Vineyards at Spanish Springs**") is a California limited liability company with its principal place of

10

business located at 285 Bridge Street, San Luis Obispo, California, in San Luis Obispo County.

52.     Each Enterprise Defendant participates in the *operation or management* of the Enterprise's affairs within the meaning of *Reves v. Ernst & Young*, 507 U.S. 170 (1993), including by directing fraudulent court filings, structuring insider liens, and falsifying judgment balances. John and Carole direct and control financial decisions and transfers. JG and Rossi formed and manage the sham entities – including ORKA and AKRO – that are being used to transfer and encumber assets. Metchik prepared and filed false pleadings to advance the Enterprise's goals, and Nelson coordinated financial structuring and the concealment of the Debtors' equity interests in assets, including their multi-million-dollar home. Lucas knowingly maintains a fraudulent lien against a luxury beachfront condo in Maui, Hawaii (the "**Maui Vacation Condo**"), held by the John and Carole King Family Trust, for the purpose of encumbering the Debtors' equity and placing it beyond the reach of legitimate creditors. Each business entity named herein, acting under the management and control of members of the Enterprise, has paid the Debtors' personal obligations, taxes, and living expenses, and knowingly and intentionally violated this Court's charging and assignment orders or purposefully concealed assets to frustrate legitimate creditors. Each Enterprise Defendant has exercised decision-making authority or has knowingly carried out directions essential to the Enterprise's illegal purpose.

53.     The activities of the Enterprise substantially affected *interstate commerce* within the meaning of 18 U.S.C. § 1962, as Defendants conducted and furthered their scheme through interstate wire transfers, interstate bank transfers, electronic communications transmitted via the internet, email transmissions, filings made through the federal courts' CM/ECF system, the U.S. Mail, and transactions involving federally insured financial institutions.

11

## JURISDICTION AND VENUE

54.     This Court has original subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this action arises under the Federal Racketeer Influenced and Corrupt Organizations Act.

55.     This Court has personal jurisdiction over Defendants Carole, John, JG, Lucas, Rossi, and Metchik because they each reside in the State of California.

56.     This Court has personal jurisdiction over Defendant Nelson pursuant to 18 U.S.C. § 1965(b) because this Court has jurisdiction over at least one defendant, and the ends of justice require that other participants in the Enterprise residing in other states, including Nelson, be brought before the Court. Alternatively, this Court has specific personal jurisdiction over Nelson because he purposefully directed activities toward California by participating in a racketeering enterprise and conspiracy centered in this state. Nelson engaged in concerted acts with the California defendants to implement and perpetuate the fraudulent scheme, including holding and assigning a deed of trust encumbering California real property for the purpose of hindering and defrauding California judgment creditors – conduct that caused and continues to cause foreseeable harm in this District. As a result, Nelson has sufficient contacts with California and the United States.

57.     This Court has personal jurisdiction over Defendants 1023 Monterey, 1035 Monterey, A.J. Spurs, Addie Street, AKRO, Apple Farm, Black Chaps, Boutique, Cliffs, DRI, Fernwood, JGK Construction, Los Lobos, Mission Grove, Montalban, ORKA, Spanish Vineyards, Sycamore, SeaVenture, and The Vineyards at Spanish Springs because they each were formed under the laws of California and conducted business in California.

58.     This Court also has personal jurisdiction over the John and Carole King Family Trust, and The Robin L. Rossi Living Trust because, upon information and

belief, each is organized and administered under the laws of the State of California and has its principal place of administration in San Luis Obispo County.

59.     Venue is appropriate in the Western Division of the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this judicial district. Specifically, Defendants Carole, John, JG, Lucas, Rossi, and Metchik reside in San Luis Obispo County, California, and the wrongful acts and plans were devised, initiated, and carried out by these Defendants through acts and communications initiated in and directed towards San Luis Obispo County, California. Venue is further proper in this District pursuant to 18 U.S.C. § 1965(a) because each defendant is found in and/or transacts affairs in this District given each Defendant's participation in the Enterprise. Venue is also appropriate in this District pursuant to 28 U.S.C. § 1391(c)(3).

## GENERAL ALLEGATIONS

### A. John E. King Builds a Family Real Estate Empire

60.     John is a real estate developer in the Central Coast region of California. He and his wife, Carole, and their son, JG, are active in the hospitality industry, owning and managing several boutique resorts and commercial properties in San Luis Obispo and Pismo Beach, California.

61.     John's prominence as a businessman in San Luis Obispo dates to at least 1985 when he and long-time business partner Rossi formed RKO Hospitality Services, Inc., now RKO, known locally as the Rossi-King Organization ("**RKO**"). Metchik served as RKO's incorporator.

62.     In 1985, the same year RKO was formed, Metchik was appointed as RKO's general counsel, a role he continues to hold nearly four decades later. According to a July 19, 1985, *Times-Press Recorder* article, John stated:

> Paul [Metchik] will be handling all tax planning for the various partnerships and business entities with RKO. He will also be responsible for negotiating and overseeing leases on the more than 400,000 square feet

of commercial and industrial properties currently owned and managed by RKO. In addition, he will be involved in several pending syndications and ongoing contract negotiations. We are really pleased to have Paul as part of our team.

Prior to joining RKO, Metchik was a partner at Fell, Marking, Abkin and Montgomery, specializing in real estate, business and tax matters. In the same article, Rossi emphasized the importance of Metchik's background and his value to RKO:

We were negotiating to purchase the Nogales Medical Building in Santa Barbara. Paul was instrumental in putting the deal together and we were favorably impressed with his business acumen and negotiating abilities.

63.    In the years that followed, John and Rossi expanded aggressively across California's Central Coast. Operating through RKO and related entities, they acquired and developed hotels, resorts, and retail centers. Under the banners of "Rossi-King Enterprises" and "King Ventures," the pair established themselves as fixtures in the region's tourism and commercial sectors.

64.    John was known for his bold ventures and appetite for risk. His early career included ambitious projects outside California, such as a casino-resort development in the U.S. Virgin Islands that collapsed amid political turmoil – an experience that revealed both John's audacity and his willingness to gamble on speculative opportunities.

65.    By the late 1980s, John had become one of the most recognizable developers on the Central Coast. Local press described him as an ambitious and creative adventurer whose projects transformed parts of San Luis Obispo and Pismo Beach into regional hospitality destinations. His business model relied heavily on interlocking partnerships, cross-owned entities, and long-term relationships with insiders such as Rossi and Metchik – relationships that would later form the backbone of the Enterprise.

66.    Through the 1990s and early 2000s, John, joined by JG, continued to acquire, develop, and refinance properties through a growing network of limited liability companies and trusts, many of which were jointly controlled by members of

14

the King Family and their closest associates. At its height, the King Family's holdings included multiple hotels, apartment complexes, and development projects across San Luis Obispo and neighboring counties.

67.    As the real estate market boomed, so too did John's reputation. Local news outlets note that King Ventures employed as many as 1,600 people at its peak and controlled a portfolio of properties valued in the hundreds of millions of dollars. But King's empire was highly leveraged, and when the mortgage crisis hit in 2007, his network of partnerships and cross-collateralized loans began to collapse – setting the stage for the financial troubles and fraudulent conduct that would follow.

**B.    The King Family Fails to Pay Its Debts, Leading to Several Large Judgments**

68.    Like many successful real estate developers, John had both wins and losses along the way. But the losses led to multiple judgments against the Debtors, and judgment liens began to threaten the King Family's real estate empire.

### i.    *The Textron Judgments*

69.    On or about November 2, 2006, Textron made a loan of $9.75 million to the King Family's company, Vaquero de los Robles, LLC, secured by real property in San Luis Obispo County. On or about January 10, 2007, Textron made a second loan of $4.7 million to the King Family's company, Spanish Springs II, LLC, also secured by real property in San Luis Obispo County. John, Carole, and JG guaranteed both loans. Each loan was cross collateralized against the property securing the other, and under the terms of the loan agreements, a default under one loan constituted a default under the other.

70.    As the loans neared maturity, Nelson – a trusted King Family insider employed by one of John's entities and a business partner of the Debtors on multiple land deals – negotiated with Textron, seeking loan modifications to extend the maturity dates.

15

71.    Textron declined to extend either loan, and both matured unpaid.

72.    On February 19, 2009, Textron filed *Textron Fin. Corp. v. Vaquero de los Robles, LLC, et al.*, Case No. CV09-01204 (C.D. Cal.) (the "***Vaquero* Action**") seeking foreclosure of deed of trust, foreclosure of security interest, and breach of guaranty. On December 29, 2009, this Court entered judgment in favor of Textron against John, Carole, and JG, jointly and severally, in the amount of **$11,434,204.55** (the "**Vaquero Judgment**"),[4] followed by an April 5, 2010, order awarding an additional **$351,145.94** in attorneys' fees and costs.[5]

73.    Separately, on February 19, 2009, Textron filed a suit captioned *Textron Fin. Corp. v. Spanish Springs II, LLC, et al.*, Case No. CV09-01205 (C.D. Cal.) (the "***Spanish Springs II* Action**"), asserting the same causes of action. On December 29, 2009, this Court entered judgment in favor of Textron against John, Carole, and JG, jointly and severally, in the amount of **$4,286,125.34** (the "**Spanish Springs II Judgment**"). Less than a month later, on January 19, 2010, the Spanish Springs II Judgment was amended to remove JG as an "erroneously included" debtor.[6] On April 5, 2010, the Court awarded Textron an additional **$321,620.94** in attorneys' fees and costs.[7]

74.    The *Spanish Springs II* Action, together with the *Vaquero* Action, are collectively referred to herein as the "**Textron Actions**."

75.    The Spanish Springs II Judgment, together with the *Vaquero* Judgment, are collectively referred to herein as the "**Textron Judgments**."

76.    Textron recorded various abstracts of judgment in San Luis Obispo County and other California counties where the King Family owned real property, as well as in

---

[4] A true and correct copy of the *Vaquero* Judgment is attached hereto as **Exhibit 6**.
[5] A true and correct copy of the Order Awarding Attorneys' Fees and Costs under the *Vaquero* Judgment is attached hereto as **Exhibit 7**.
[6] A true and correct copy of the Spanish Springs II Judgment, as amended, is attached hereto as **Exhibit 8**.
[7] A true and correct copy of the Order Awarding Attorneys' Fees and Costs under the Spanish Springs II Judgment is attached hereto as **Exhibit 9**.

16

Texas and Hawaii. The recorded abstracts established judgment liens in favor of Textron that attached to certain properties owned by John, Carole, or JG in the counties where the abstracts were recorded.

### ii.    *The Wells Fargo Judgment*

77.    In July 2008, while the Debtors were engaged in negotiations with Textron to extend or modify the Textron loans maturing in November 2008, they obtained a new $9 million loan from Wells Fargo Bank, National Association ("**Wells Fargo**"). The Wells Fargo loan was secured by the Inn at Morro Bay property and personally guaranteed by the John and Carole King Family Trust.

78.    The Debtors' attempt to juggle mounting obligations was short-lived. Within months, the Textron negotiations collapsed, the Textron loans went into default, and the Wells Fargo loan soon followed.

79.    Wells Fargo foreclosed on the Inn at Morro Bay, leaving a deficiency balance. On May 25, 2011, San Luis Obispo Superior Court entered a stipulated judgment in the amount of **$709,682.68** in *Wells Fargo Bank, Nat'l Ass'n vs. Inn at Morro Bay, LLC, et al.*, Case No. CV100056, in favor of Wells Fargo and against John, individually and as co-trustee of the John and Carole King Family Trust, and Carole, as co-trustee of the John and Carole King Family Trust, in that amount, with interest accruing at the statutory rate (the "**Wells Fargo Judgment**").

80.    Like Textron, Wells Fargo recorded judgment liens against certain Debtors' properties held in the John and Carole King Family Trust.

81.    On information and belief, the Wells Fargo Judgment remained unpaid and expired in 2021.

82.    Although unrelated to Plaintiffs' judgments, the Wells Fargo Judgment exemplifies the Debtors' broader pattern of conduct – repeatedly taking on significant commercial debt while financially overextended, then defaulting and leaving creditors unpaid. The Debtors' failure to satisfy this judgment, like many before and after it,

reflects a consistent disregard for their lawful obligations and foreshadows the fraudulent schemes later carried out through the Enterprise.

### iii.   The EWB Judgment

83.    In December 2006, United Commercial Bank ("**UCB**") extended a $4.5 million commercial loan to a King Family entity, Fresno Pacific Towers, Inc. ("**Fresno Pacific**"), which was personally guaranteed by the Debtors. The loans matured in July 2008, and Fresno Pacific failed to pay. As of November 30, 2010, the outstanding principal remained at $4,500,000 plus $593,375 in accrued interest and $5,025 in late charges.

84.    East West Bank ("**EWB**"), as UCB's successor, filed suit on December 9, 2010, in San Francisco Superior Court, Case No. CGC-10-505989, seeking judgment on the Debtors' written guaranties. As noted, the court entered judgment on September 14, 2011, in favor of EWB and against the Debtors, jointly and severally, in the principal amount of **$5,434,547.68**, together with interest at ten percent per annum from entry until paid. On December 19, 2011, the court awarded an additional **$60,914.00** in attorneys' fees and costs, endorsed upon the judgment.

85.    On September 28, 2011, EWB filed a Partial Satisfaction of Judgment, crediting $1.9 million to the judgment – proceeds of EWB's foreclosure of the property securing the loan.

86.    EWB recorded abstracts of judgment in San Luis Obispo County and other California counties where the King Family owned real property.

87.    On May 17, 2021, EWB assigned its judgment to Plaintiff Wolverine pursuant to Cal. Code Civ. Proc. § 673. On June 21, 2021, Wolverine renewed the judgment for **$7,077,693.78**, inclusive of accrued interest and credits after judgment. With continuing post-judgment interest, costs, and attorneys' fees, the EWB Judgment now exceeds $10 million and remains unsatisfied.

18

#### iv.   *The IFIC Judgment*

88.   In 2013, Nacimiento Water Company, Inc. ("**Nacimiento**") filed suit in this Court against International Fidelity Insurance Company ("**IFIC**") and others, arising out of a performance-bond dispute concerning a Nacimiento project in San Luis Obispo County. IFIC cross-claimed against SMS Resorts, Inc. and the Debtors based on written indemnity agreements executed in favor of IFIC.

89.   On July 8, 2016, the Court entered judgment in favor of IFIC and against the Debtors and SMS Resorts, Inc., jointly and severally, in the total amount of **$1,550,000.00**, comprised of $1,395,829.00 in principal and $154,171.00 in pre-judgment interest (the "**IFIC Judgment**"). The parties waived recovery of attorneys' fees and costs and agreed that post-judgment interest would accrue at the statutory rate.

90.   IFIC recorded various abstracts of judgment in San Luis Obispo and Monterey Counties in California and in Maui County, Hawaii, where the King Family owned real property, establishing judgment liens in favor of IFIC that attached to certain properties owned by John, Carole, or JG in the counties where the abstracts were recorded.

91.   Of note, IFIC obtained the senior-most judgment lien against the Debtors' Maui Vacation Condo, through the registration of the IFIC Judgment in the United States District Court for the District of Hawaii and recording notice on September 13, 2017.

92.   JG formed Los Lobos on June 10, 2022.

93.   On July 26, 2022, Los Lobos entered into an agreement with IFIC to acquire the IFIC Judgment for consideration of $1,000,000. The IFIC Judgment, together with all associated judgment liens and enforcement rights, was thereafter assigned to Los Lobos.

#### v.   *The Insurance Company of the West Judgment*

94.   On February 3, 2016, Insurance Company of the West ("**ICW**") filed a

19

civil complaint in San Luis Obispo Superior Court against John's entity Spanish Springs LLC ("**Spanish Springs**"), John, individually and doing business as King Ventures, and Carole, asserting causes of action for breach of contract, contractual indemnity, and statutory reimbursement.

95. The complaint arose from a performance bond issued by ICW in connection with the Spanish Springs Tract 2388 subdivision project in San Luis Obispo County. Following the project's default and foreclosure, ICW satisfied San Luis Obispo County's bond demand and sought reimbursement from the Debtors under written indemnity agreements.

96. On September 14, 2017, the San Luis Obispo Superior Court entered judgment in favor of ICW and against Spanish Springs and the Debtors, jointly and severally, in the total amount of **$5,842,224.68**.

97. On May 13, 2021, ICW assigned the judgment to Coronitas pursuant to Cal. Code Civ. Proc. § 673. With accrued post-judgment interest, the ICW Judgment now exceeds $11 million and remains unsatisfied.

**C.   The Textron Satisfaction Agreement**

98. On December 22, 2010, after years of default and litigation, the King Family and Textron entered into the Textron Satisfaction Agreement, under which the King Family would satisfy the Textron Judgments – then carrying a combined outstanding balance of more than $9 million – in exchange for the satisfaction of both judgments and the release of all related liens.

99. Under the Textron Satisfaction Agreement, the King Family agreed to pay Textron $4 million over ten years to satisfy both judgments. The discounted payment schedule began with three annual installments of $1 million each (2010-2012), followed by smaller payments between 2013 and 2020 totaling $1 million. To secure this obligation, the King Family pledged all present and future assets of the Debtors, promised not to encumber those assets without Textron's written consent, and

20

authorized Textron to obtain charging orders "against the interests of John, JG, Carole, Palm Dunes LLC ("**Palm Dunes**"), and Spanish Springs II, and Vaquero in any and all real property." In effect, every dollar flowing through the King Family's vast network of companies was pledged to Textron until the debt was extinguished.

100. Between 2010 and 2012, Textron enforced these commitments aggressively. Acting in tandem with the King Family, Textron obtained a series of stipulated charging and assignment orders in the Textron Actions, extending its reach to more than two dozen King-controlled businesses.

101. The first of these orders, entered July 27, 2010, required Palm Dunes to make direct payments to Textron to satisfy the *Vaquero* Judgment. Over the next two years, additional orders followed, compelling a broad range of affiliated companies – including Boutique, SeaVenture, Sperry Flour, Sycamore, Cliffs, Fernwood Resort, and multiple partnerships and limited-liability companies – to pay or transfer directly to Textron any and all payments, distributions, or other rights otherwise due to the Debtors, in partial satisfaction of the Textron Judgments.

102. On May 15, 2012, identical assignment orders were entered in both the Textron Actions, directing the Debtors to assign their rights to payment from additional affiliates – among them Apple Farm, SMS Resorts, Rossi Enterprises, and RKO – to Textron.

103. The charging orders entered in the Textron Actions on February 28, 2011, April 20, 2012, and June 21, 2012, and the assignment orders entered in the Textron Actions on May 15, 2012, are collectively referred to as the "**2012 Charging and Assignment Orders**."

104. The 2012 Charging and Assignment Orders redirected the Debtors' economic rights in their business network to Textron – specifically the rights to receive distributions – and prevented the Debtors from diverting funds for their own benefit. The entities identified in those orders – including Palm Dunes, and all others listed in

paragraphs 99-102, we well as DRI – are collectively referred to herein as the "**Complicit Entities**." Each was owned, managed, or dominated by members of the King Family or their associates and later used by the Enterprise to conceal income, divert assets, and violate the very court orders that bound them. Although many of the stipulated 2012 Charging and Assignment Orders were entered against or agreed to by the Debtors, JG was also a party under several of those stipulations and, as a debtor in the *Vaquero* Action, held interests affected by the orders entered therein.

### D. The Enterprise Is Formed to Conceal, Divert, and Shield Assets from Enforcement Efforts

105. Between 2010 and 2014, Textron received five installment payments totaling $3.4 million of the $4 million owed to Textron under the Textron Satisfaction Agreement, all remitted by The Vineyards at Spanish Springs, an insider entity owned and controlled by John and JG. By December 2015, only $600,000 remained due under the Textron Satisfaction Agreement. Yet on January 13, 2016, ORKA – funded by the Enterprise through the very same Vineyards entity – wired the entire $600,000 to Textron, even though a prepayment discount reduced the amount owed as of that date to approximately $520,000. Though disguised as belonging to ORKA, it was the Debtors' own money that was used to pay the balance of funds owed to Textron.

106. However, the King Family never intended that payment to satisfy the Textron Judgments or release Textron's liens, charging orders, or assignment orders. Instead, acting through their long-time partner and counsel, Metchik, the King Family executed a plan to keep Textron's enforcement rights alive but under their own control. Rather than allowing that final payment to extinguish Textron's claims, they engineered a paper transfer of the judgments to an insider entity they directed.

107. In fact, during a 2024 judgment debtor examination ("**JDE**"), John admitted he instructed Rossi and JG to "get involved in this thing" to "protect their interest" and "see what they [could] do to help themselves." Acting on those

instructions, Rossi and JG formed ORKA, capitalized it with the $600,000 supplied from within the Enterprise, and used those funds to complete the transfers. Therefore, what should have been the final payment satisfying all Textron's claims instead became the seed capital for the initial phase of the King Family's asset protection scheme. Despite Textron having received the full benefit of its bargain under the Textron Satisfaction Agreement, no satisfactions of judgment were filed with this Court; rather, assignments of two fully satisfied judgments were filed. Through emails and interstate wire transfers, this maneuver transferred to the Enterprise the very economic rights that had previously secured Textron's recovery – including the right to receive income and distributions from entities owning multi-million-dollar properties, via charging and assignment orders.

108.   Once acquired, the Enterprise used these instruments not to satisfy debt, but to obstruct collection of it. When Wells Fargo, EWB, ICW, and IFIC sought to collect on their judgments, they ran headlong into the Textron-derived liens now held by ORKA – insider liens that appeared "senior" on record but were, in truth, self-dealing encumbrances designed to block enforcement by legitimate creditors and preserve the King Family's control over its empire.

109.   What began as performance under a negotiated settlement with Textron became the blueprint for a decade-long racketeering enterprise. By acquiring their own judgments, the Enterprise inverted the enforcement process – transforming the very tools meant to ensure repayments of court-ordered obligations into instruments of fraud.

E.    **The Enterprise Carries Out Its Mission through Extensive Wire Fraud and Obstruction of Justice**

i.    ***Money Laundering and Concealment of Proceeds***

110.   Defendants used the Complicit Entities as conduits for the movement of funds derived from their fraudulent activity. These entities received, transferred, and disbursed money obtained through mail and wire fraud and through violations of

charging and assignment orders issued by this Court. The transactions were structured through multiple layers of transfers and accounts to conceal the true ownership and control of the Debtors' equity and to disguise their continued access to Enterprise assets despite judicial restraints.

111. Each Enterprise entity generated its own revenues through ongoing business operations reflected in its profit-and-loss statements. Rather than retaining those funds or applying them to legitimate business purposes, the Enterprise used the entities to pay the Debtors' personal and household expenses, issue credit cards for their daily use, and make disguised distributions in violation of this Court's charging and assignment orders.[8] These transactions constituted money laundering within the meaning of 18 U.S.C. §§ 1956 and 1957, as the Enterprise Defendants knowingly conducted and attempted to conduct financial transactions affecting interstate commerce involving the proceeds of specified unlawful activity with the intent to conceal and disguise the nature, source, ownership, and control of those proceeds. By diverting entity revenues in this manner, the Debtors and the Complicit Entities maintained the appearance of compliance with this Court's charging and assignment orders, all the while continuing to live off the Enterprise's concealed income and assets, thereby perpetuating and concealing the ongoing racketeering scheme.

112. In other words, Textron's 2012 Charging and Assignment Orders, inherited by ORKA via the judgment assignment, required the Complicit Entities to refrain from making any payments to the Debtors, and instead redirect those payments to Textron (subsequently ORKA, and now AKRO). Most of those Complicit Entities were owned, operated, and/or controlled by John and his son, JG. But as a member of ORKA, this put JG in a nonsensical position. Any legitimate creditor would be incentivized to fully enforce its charging and assignment orders in order to collect on its judgments. But by controlling both sides of the debtor-creditor relationship, JG demonstrated the opposite

---

[8] These distributions also violated a $200,000 annual income limitation contained within the Textron Satisfaction Agreement.

incentive – prevent collection from the Complicit Entities, while also preventing other junior creditors from being able to obtain or enforce their own charging and assignment orders against these and other King Family entities. Indeed JG, in full control of the proverbial "purse strings" for the Complicit Entities, ensured virtually nothing was paid from those entities directly to ORKA or the Debtors, leaving the Textron Judgments unsatisfied. Instead, he sent millions of dollars to mortgage companies, attorneys, health insurers, credit card companies, taxing authorities and others, all on behalf of his parents, the Debtors, and all from Complicit Entities. This directly furthered the primary goal of the Enterprise – keep all of the money in the family through false and misleading legal maneuvering and leave the Textron Judgments in blocking position.

113.    In furtherance of the fraud, using U.S. Mail, ACH transfers, and interstate wire transactions, the millions of dollars JG paid on behalf of his parents from the Complicit Entities, without redirecting or crediting any of those payments to the Textron Judgments – violated the same 2012 Charging and Assignment Orders he was pretending to enforce. The two people that should have instructed ORKA and AKRO's counsel, Metchik, to file credits or satisfactions for the Textron Judgments were Rossi and JG. However, they had every reason to do anything but that: The entire scheme would collapse; the Enterprise would fail. And when JG was questioned as to whether he saw "some sort of conflict of interest" in wearing both debtor and creditor hats here, naturally he responded, "I really don't." No legitimate creditor would have allowed money to flow through its hands for the benefit of its debtors. These egregious payments were fraudulent and deceived this Court and legitimate creditors like Plaintiffs, who held junior liens to ORKA and, subsequently, AKRO.

114.    Based on general ledgers provided by the Debtors to Wolverine, from December 31, 2015 through 2022, JG has paid expenses of his parents totaling at least $4,881,428 through transfers between the following subset of the Complicit Entities alone, without crediting any of the transfers towards the Textron Satisfaction Amount,

Case No.
COMPLAINT

assuming arguendo the purchase price paid by ORKA to Textron should not have been deemed satisfaction of the Textron Judgments.

| Transferor (Defendant) | Transferee (Defendant) | Amount |
|---|---|---|
| Apple Farm | Black Chaps | $375,000 |
| Boutique | Black Chaps | $3,086,055 |
| Cliffs | Black Chaps | $6,197 |
| Fernwood | Black Chaps | $190,000 |
| Mission Grove | Black Chaps | $136,549 |
| Montalban | Black Chaps | $8,203 |
| Spanish Vineyards | Black Chaps | $48,710 |
| Sycamore | Black Chaps | $480,000 |
| SeaVenture | Black Chaps | $550,714 |
| **Total** | | **$4,881,428** |

115. Each of the above-named transferors has violated this Court's 2012 Charging and Assignment Orders by distributing millions of dollars to Black Chaps, effectively, a "washing machine," operating as the cornerstone of the King Family's money laundering scheme. Black Chaps is owned equally by the Debtors, and this structure has enabled the Debtors to have nearly all their life expenses covered without ever depositing a dollar into their own personal bank accounts. Because JG controls both the Textron Judgments and the Complicit Entities' finances (including Black Chaps'), the scheme operates unchecked and places assets beyond the reach of legitimate creditors. On information and belief, the King Family executed additional money laundering and/or fraudulent transfers through Black Chaps and/or other entities in furtherance of the Enterprise's scheme.

116. Had the Complicit Entities complied with any of the charging and assignment orders issued by this Court, the Textron Judgments would have been

26

satisfied in full years ago, eliminating the sham debts that currently prevent Plaintiffs from enforcing their judgments against the Debtors' assets.

117.   Plaintiffs attach hereto as **Exhibit 10** a flow chart summarizing the above-referenced payments into and out of Black Chaps for the benefit of the Debtors.

118.   Not all laundering and/or fraudulent transfers were made through Black Chaps, however. For instance, between February 15, 2022, and February 17, 2022, Boutique, Cliffs, Fernwood, Higuera, and SeaVenture collectively transferred more than $1.5 million into bank accounts of King Ventures – a dba of John himself – which funds were then wired to the Internal Revenue Service and the California Franchise Tax Board for payment of the Debtors' 2021 personal tax obligations.

119.   The King Family deliberately chose not to redirect any payments to ORKA or otherwise credit any payments towards the Textron Satisfaction Amount, and these payments were made through the use of interstate wires and ACH transfers.

120.   Instead, the King Family and ORKA swept "under the rug" the Textron Satisfaction Agreement, an agreement that was conveyed to them by Textron, and was never amended, modified or otherwise, per King Jr's own testimony, and ORKA, now AKRO, proceeded to use Textron's judgments to unlawfully siphon the Debtors' assets out of their names, using the Textron Judgments as both a sword and a shield.

121.   As a further illustration of their audacious money laundering scheme, John and JG have both testified that Cliffs is controlled by JG. In addition to the $6,197 shown in the table above, Cliffs – a Complicit Entity – issued several credit cards to John and Carole for their personal use, including payment of their living expenses. For example, on November 5, 2021, Carole charged $1,169 for auto repairs in Kihei, Hawaii, on a Visa issued in the name of Cliffs. The following day, November 6, 2021, she charged $671 at the furniture store Mind's Eye in Lahaina, Hawaii. John used his Cliffs American Express card almost exclusively for personal expenses, including a $450.07 charge at Five Cities Veterinary Hospital on May 17, 2022, and a $177.16

27

purchase at Big 5 Sporting Goods on November 27, 2021. These examples represent only a portion of the thousands and thousands of dollars in personal expenses charged by the Debtors to Cliffs' credit cards over the years. This raises a fundamental question: How is it that the individual (JG) controlling the Debtors' senior-most creditor (AKRO) is allowing a charged entity (Cliffs) to issue and pay for credit cards used by his very own judgment debtors? This could only be possible through fraud.

### ii.    *Sham Foreclosures Via Marshal's Sales*

122.    On or about July 22, 2016, in the *Vaquero* Action, Metchik, acting on behalf of ORKA, prepared and signed Process Receipt and Returns instructing the United States Marshal to levy upon the interests of the Debtors in the commercial properties located at 1009-1025 Monterey Street and 1035-1037 Monterey Street in San Luis Obispo, California, publicly encumbering those properties. Metchik then directed mail service of notices of these sham levies to various lienholders, tenants, co-owners, and other interested parties, in furtherance of the Enterprise's scheme to enforce on falsely inflated judgment balances and obstruct legitimate creditor recoveries from more junior creditors. These documents were prepared and distributed using interstate commerce, including the internet, email, and U.S. Mail.

123.    Months later, in or around April 5, 2017, Metchik filed an Affidavit and Request for Order Authorizing Sale with this Court in the *Vaquero* Action. Metchik once again omitted any reference to the Textron Satisfaction Agreement or the amounts received for the Textron Judgments, and once again falsely identified the *Vaquero* Judgment balance as more than $5 million. Metchik sought authorization for the U.S. Marshal to sell John's 50% interest and Carole's 50% interest in these Monterey Street properties towards satisfaction of the *Vaquero* Judgment, to which the Court agreed. Metchik then used the U.S. Postal Service to mail out notices of these sham execution sales to various lienholders, tenants, co-owners, and other interested parties. These documents were prepared and distributed using interstate commerce, including the

internet, email, and U.S. Mail. Notably, notice to EWB was mailed to an incorrect address.

124. On May 16, 2017, ORKA purchased John and Carole's combined 50% interest in 1009-1025 and 1035-1037 Monterey Street through a single nominal credit bid of only $6,000 at the execution sale, thereby extinguishing Plaintiffs' and other creditors' junior liens against the property.

125. Plaintiffs allege that the combined fair market value of these properties was between $7.3 million and $10.1 million in July 2017, valuing the Debtors' interest between $3.6 million and $5 million – far surpassing the amount ORKA paid for these properties.

126. As a result of this execution sale, the Debtors transferred their ownership of these multi-million-dollar properties to their insider ORKA for a grand total of $6,000 – as a credit bid on a judgment that should have been recorded as satisfied at least one year prior. This removed between $5 million and $6.3 million in assets out of the Debtors' names, and by stripping junior liens, out of the reach of legitimate creditors like Plaintiffs.

127. Relentless in their quest for asset protection, on or about June 5, 2020, ORKA transferred its interest in 1009-1025 Monterey Street, to 1023 Monterey Investors for no consideration. The grant deed, electronically recorded via an online recording system transmitted through interstate internet channels by Metchik on December 4, 2020, claimed an exemption for documentary transfer tax under Cal. Rev. & Tax. Code § 11925(d), stating "Grantor(s) and grantee(s) are comprised of the same parties, and their proportional interest remains the same immediately following transfer." In other words, JG and Rossi continued to hold this interest on behalf of the Enterprise.

128. On the same day, ORKA transferred its interest in 1035-1037 Monterey Street, to 1035 Monterey Investors for no consideration. The grant deed, electronically

29

recorded via an online recording system transmitted through interstate internet channels by Metchik on December 4, 2020, claimed an exemption for documentary transfer tax under Cal. Rev. & Tax. Code § 11925(d), stating "Grantor(s) and grantee(s) are comprised of the same parties, and their proportional interest remains the same immediately following transfer." Again, JG and Rossi continued to hold this interest on behalf of the Enterprise.

129.    The Enterprise repeated this exact sham between March 21, 2018, and May 14, 2019, on additional properties located at 2015 Monterey Street and 2121 Monterey Street in San Luis Obispo, California – the Apple Farm Inn, a key asset in the Debtors' real estate portfolio. After falsely inflating the outstanding judgment owed under the *Vaquero* Action in affidavits filed with the court and receiving writs of execution for these properties (and serving notices of levies via U.S. Mail), ORKA purchased the Debtors' combined 50% interest in these properties through a single credit bid of $6,000 at execution sale, again eviscerating junior liens such as Plaintiff's. Plaintiffs are informed and believe that the combined fair market value of these properties was between $21.1 million and $25 million in May 2019. These documents were prepared and distributed using interstate commerce, including the internet, email, and U.S. Mail.

130.    Yet again, the Debtors were able to transfer their ownership of two highly valuable parcels of commercial property to their insider for a credit bid of only $6,000. This fraud was only possible because the Enterprise ensured ORKA remained a senior creditor and hid behind the Textron Judgments, which in actuality should have been recorded as satisfied years before.

131.    By falsely inflating the outstanding judgment balance, the Enterprise created the illusion that millions remained due under the *Vaquero* Judgment, deterring third-party bidders and chilling competition at the U.S. Marshal's sales. With no legitimate bidders willing to compete against a potentially multimillion-dollar credit bid, ORKA purchased the properties sold at each U.S. Marshal's sale for only $6,000.

30

This scheme deprived legitimate creditors of recovery, stripped junior liens – including the EWB Judgment lien and the ICW Judgment lien – from the properties, and reduced the documentary transfer tax, imposed at a rate of $0.55 per $500 of consideration, to a negligible amount based solely on the nominal credit bid, depriving the County of San Luis Obispo of tax revenue that would have been significantly higher in either a competitive-bid or market-sale scenario.

132. In one of the most brazen examples of the Enterprise's ongoing concealment scheme, the Enterprise used the April 25, 2019, U.S. Marshal's sale as a paper transfer to mask continued control and benefit. Despite the Debtor's ownership interest in 2015 and 2121 Monterey Street having been lost at that U.S. Marshal sale, John continued to make eleven consecutive monthly payments of $87,481.87 from his personal bank account toward the mortgage secured by those same properties. These payments totaled **$962,300.57**, including **$351,056.78 in principle**, directly reducing debt and building equity for the Enterprise through ORKA, the entity holding title. Meanwhile, co-borrower Rossi, remained on the loan but made no such payments during this period. By personally funding mortgage payments for assets he purportedly no longer owned, John preserved the properties' value and his own financial stake while shielding them from creditor reach. This pattern of post-sale payments exposes the sham nature of the foreclosure and abuse of this Court's process, further demonstrating the Enterprise's open-ended continuity of concealment and control.

133. On November 19, 2020, more than eighteen months after relinquishing control of the properties at 2015 Monterey Street and 2121 Monterey Street, John made property tax payments totaling **$103,291.97** from his personal bank account for those same properties.

134. On June 5, 2020, JG and Rossi formed AKRO. As with ORKA, Metchik is AKRO's organizer and agent for service of process. These formation documents were prepared and distributed using interstate commerce, including the internet, email, and

U.S. Mail.

135.   On the same day that AKRO was formed, Rossi signed two Assignments of Judgment and Acknowledgements of Assignment on behalf of ORKA, whereby ORKA assigned the Textron Judgments to AKRO. In 2020 and 2021, Metchik electronically filed these assignments in the *Vaquero* Action and the *Spanish Springs II* Action, respectively. These documents were prepared and distributed using interstate commerce, including the internet, email, and U.S. Mail.

136.   Metchik, on behalf of AKRO, then filed an Affidavit and Request for Issuance of Writ of Execution in the Textron Actions, once again inflating judgment balances, interests, and costs and omitting material facts under penalty of perjury. These documents were prepared and distributed using interstate commerce, including the internet, email, and U.S. Mail.

137.   AKRO, having stepped into ORKA's shoes, continued the fraudulent scheme to shield the King Family's assets through sham security interests. For example, in or around March 2, 2021, Metchik, on behalf of AKRO, signed a Process Receipt and Return instructing the US. Marshal to levy upon the King Family's interests in eight acres of vacant land located at 6900 Ontario Road, San Luis Obispo, California ("**6900 Ontario Road**") and the Avila Hot Springs property at 250 Avila Beach Drive, San Luis Obispo, California ("**250 Avila Beach Drive**") and then prepared another fraudulent affidavit to acquire court orders authorizing the sale of these properties. These documents were prepared and distributed using interstate commerce, including the internet, email, and U.S. Mail.

### iii.   *State Court Manipulation and Fraud*

138.   In furtherance of the scheme, on November 3, 2021, Metchik, acting on behalf of AKRO, improperly and in violation of the California Enforcement of Judgments Law, filed a state court action to "enforce" the federal Spanish Springs II Judgment against John, and signed an Application and Order for Appearance and

32

Examination ("**ORAP**") in the Superior Court of California, County of San Luis Obispo, Case No. 21CV-0621. In support of the ORAP, Metchik concurrently filed a sworn declaration that Textron obtained the Spanish Springs II Judgment in 2010, Textron assigned the Spanish Springs II Judgment to ORKA in 2016, ORKA assigned the Spanish Springs II Judgment to AKRO in 2020, and the outstanding balance of the Spanish Springs II Judgment was **$1,143,181.43**. As with Metchik's prior affidavits filed in the Central District of California, Metchik's declaration omitted any reference to the Textron Satisfaction Agreement, or the amounts received that were sufficient to satisfy the Textron Judgments. Unsurprisingly, John did not object to AKRO's ORAP, which the Court issued. These documents were prepared and distributed using interstate commerce, including the internet, email, and U.S. Mail.

139.   John's judgment debtor examination (a "**JDE**") was scheduled for January 6, 2022. Plaintiffs allege on information and belief that AKRO never conducted this examination, and that the ORAP was only filed for the improper purpose of securing yet another lien against John, i.e., the one-year lien on all personal property of a judgment debtor, formed by personal service of an ORAP under Code of Civil Procedure section 708.110(d). AKRO has since extended its sham ORAP lien, without lapse and with no objection by John, through March 2026. AKRO has used this ORAP lien to encumber all of John's personal property from the reach of Plaintiffs.

### iv.   *The 2022 Charging Order*

140.   On February 4, 2022, several months after Wolverine renewed the EWB Judgment, Metchik filed a Motion for Charging Order on behalf of AKRO in the *Spanish Springs II* Action, against King Family entities Nipomo Properties LLC, Oak Shores Group LLC, Shaffer Lane LLC, Hunter Ranch Golf Course LLC (formerly SLO Investments LLC), and SLO South Higuera, LLC, and debtors Higuera and Spanish Vineyards. Metchik used a sham JDE of his client, John, as his basis for obtaining additional sham charging orders against King Family entities. Unsurprisingly, the

33

Debtors did not oppose the motion.

141. In the motion, Metchik represented that John testified at his JDE on January 6, 2022, that John and/or Carole own membership interests in the above-listed limited liability companies. Metchik failed to attach any transcript of the purported examination and again omitted any reference to the Textron Satisfaction Agreement or the amounts received that were sufficient to satisfy the Textron Judgments.

142. Metchik also concealed from this Court that: (i) Metchik has been business partners with his client's sham debtor, John, for roughly 40 years; (ii) Metchik is concurrently business partners with John, JG and Rossi; (iii) Metchik remains an owner of RKO, alongside John and Rossi; (iv) in 2002, Metchik formed and became an owner of Sperry Flour LLC – one of the Complicit Entities in the 2012 Charging and Assignment Orders – alongside John and Rossi, and remains an owner of that entity today alongside John and JG; and, most egregiously, (v) Metchik formed one of the companies he was seeking the new charging order against: Oak Shores Group LLC.

143. Even without knowing about Defendants' unlawful asset protection scheme, on March 10, 2022, United States Magistrate Judge Karen L. Stevenson issued a Report and Recommendation to deny the Motion for Charging Order. Judge Stevenson noted several suspicious aspects about the motion, such as (i) the Debtors' non-opposition; (ii) lack of service on the subject companies; and (iii) lack of supporting evidence.

144. Unfazed, on March 30, 2022, Metchik filed a 14-page Objection to Judge Stevenson's Report and Recommendation. In response to Judge Stevenson's finding of inadmissible evidence, Metchik still failed to attach a transcript of the purported judgment JDE of John. Instead, Metchik emphasized the Debtors had not opposed the motion or refuted Metchik's statements concerning the Debtors' membership interests in the subject companies. In response to Judge Stevenson's finding of inadequate

Case No.
COMPLAINT

service, Metchik stated that he had caused the motion to be served on JG (e.g., his business partner, friend, and client), as agent for service of process for these companies.

145.   In response to Judge Stevenson's finding of a lack of supporting evidence, Metchik attached three statements filed by Oak Shores Group LLC with the California Secretary of State in an effort to demonstrate John and Carole own the company. Critically, Metchik intentionally omitted the formation document from 1999, which reflects that Metchik organized the company and signed its Articles of Organization.

146.   Metchik thus intentionally concealed his professional and interpersonal relationship with the King Family, including his formation of a company he was seeking a sham charging order against, to further the Enterprise's scheme of encumbering the Debtors' assets to the detriment of legitimate creditors like Plaintiffs.

147.   On April 6, 2022, Judge Stevenson, unaware of the Enterprise's scheme or of Metchik's repeated perjury, issued an Amended Report and Recommendation to grant the Motion for Charging Order.

148.   On April 28, 2022, this Court issued an order accepting the Amended Report and Recommendation of Magistrate Judge Stevenson and issued the charging order (the "**2022 Charging Order**").

149.   During the relevant period, Black Chaps has paid over $3,690,356 for personal expenses of the Debtors, without crediting any of the transfers towards the Textron Satisfaction Amount, in violation of both the 2012 Charging and Assignment Orders and 2022 Charging Order. Such personal expenses include:

    a. $1,085,086 in mortgage payments, property tax payments, and maintenance payments for the Debtors' Sydney Street Residence.

    b. $142,000 in property tax payments for the King Family's office at 285 Bridge Street, San Luis Obispo, California 93401.

    c. $488,454 in mortgage payments, homeowners' association payments, utilities, and insurance payments for the Debtors' Maui Vacation Condo.

    d.  $480,000 in tax payments for the Debtors to the Internal Revenue Service and California Franchise Tax Board.

    e.  $1,129,729 in healthcare expenses for the King Family and their relatives.

150.  Plaintiffs attach hereto as **Exhibit 11** a non-exhaustive compilation of sample transactions demonstrating repeated violations of the 2012 Charging and Assignment Orders and the 2022 Charging Order. These transactions, drawn from multiple Complicit Entities over many years, show funds routed through Black Chaps, A.J. Spurs, Apple Farm Collections, SeaVenture, Sycamore Mineral Springs, Mission Grove Associates, Boutique Hotel Collection, Fernwood Resort, and related entities, and then distributed for the personal benefit of the Debtors rather than remitted toward satisfaction of the Textron Judgment.

151.  Moreover, after DRI's incorporation on April 11, 2022, the entity gradually took over Boutique's role as a passthrough entity that helped launder money between hotel entities within the Enterprise, Black Chaps, and the King Family. Neither Boutique nor DRI owned any legitimate assets but merely existed to help the Enterprise launder money. At a February 17, 2022, JDE, John stated that Boutique was the "managing entity" for various hotels that includes the Cliffs Hotel and Spa, the SeaVenture Beach Hotel, Sycamore Mineral Springs Resort & Spa, and Avila Hot Springs. On information and belief, Boutique operated as the managing entity for other hotels within the Enterprise as well. Testimony by Terri Reay on September 19, 2024, confirmed that she worked at Boutique as controller and HR manager, and then at DRI. She testified that her roles never changed and that DRI never built any new management office, but rather that it was a new entity developed for the purpose of carrying out the fee-collecting and fraudulent passthrough payment activities previously carried out by Boutique. Both Boutique and DRI facilitated unlawful payments from hotel entities to the Debtors for their personal bills and expenses. Neither entity owns any hotels, has no direct operations, nor provides any legitimate management services.

36

*v.* **<u>The Enterprise's Rampant Obstruction of Plaintiffs' Enforcement Efforts</u>**

152.   While the Debtors have happily allowed the "enforcement" efforts of their sham creditor, ORKA, the Debtors and AKRO have jointly and aggressively obstructed all enforcement efforts of Plaintiffs, including Plaintiff Wolverine's 2022 motion for charging order in the EWB Action that sought to charge the membership interests of the Debtors in seven LLCs. AKRO filed a motion for leave to intervene, arguing that it was the assignee of the *Vaquero* Judgment, had secured a senior ORAP lien against all of John's personal property (encumbering his membership interests in these companies), and that AKRO had already filed a senior Motion for Charging Order concerning the same companies in the *Spanish Springs II* Action. Plaintiffs have thus been unable to obtain charging orders against these companies, which are shielded by the Enterprise, through process such as the involuntary bankruptcy proceedings discussed below.

153.   The Debtors and AKRO have also appealed multiple post-judgment orders entered in favor of Plaintiff Wolverine, in a concerted effort to delay and hinder Wolverine's enforcement efforts in perpetuity. For example, on June 30, 2022, Wolverine subpoenaed the Debtors for copies of their tax returns. The Debtors refused to comply, and Wolverine moved to compel. The San Luis Obispo Superior Court issued an order compelling compliance. The Debtors still refused to comply, instead opting to appeal the order. After the California Court of Appeal dismissed their appeal, the Debtors filed a petition for a writ of mandate. After the Court of Appeal denied that petition, the Debtors still refused to comply, leading to another order compelling compliance. The Debtors finally produced their tax returns to Wolverine on August 26, 2024 – over two years after service of the subpoenas.

154.   More generally, the Enterprise has obstructed Plaintiffs' discovery efforts at every turn. For example, over the last four years, members of the Enterprise – including John, Carole, JG, Rossi and many of the Complicit Entities – have filed over

160 motions to quash and supporting papers, in multiple courts, to block Plaintiffs' subpoenas to financial institutions and entities and individuals with knowledge of the Debtors' assets.

### vi.    Shielding Debtors' Real Property Interests

155. The King Family has also conspired with Nelson and JG's JGK Construction to shield their primary residence through a "friendly" lien. The Debtors executed a deed of trust in favor of First Bank of Beverly Hills in 2006 to secure their $4.2 million home located at 1925 Sydney Street, San Luis Obispo, California 93401 (the "**Sydney Street Deed of Trust**"). On or about September 11, 2012, Nelson acquired that deed, and the recorded assignment lists his address at 1923 Sydney Street, San Luis Obispo, California 93401 – an address that does not exist for mailing purposes and corresponds to undeveloped land adjacent to the Debtors' primary residence that secures the Sydney Street Deed of Trust. As with ORKA and AKRO, Nelson is a non-arms-length creditor; he is a longtime employee and friend of the King Family. Indeed, Nelson himself maintains an active joint bank account with Carole, which she has used to pay personal expenses for herself and John.

156. Through the thirteen years in which Nelson held the Sydney Street Deed of Trust, he never requested nor received any loan payments from the Debtors and never enforced the $4.2 million Sydney Street Deed of Trust through foreclosure or otherwise.

157. Shockingly, on June 30, 2025, Nelson assigned the Sydney Street Deed of Trust to JGK Construction, an entity formed by JG a month prior. The assignment was recorded on July 14, 2025. These documents were prepared and distributed using interstate commerce, including the internet, email, and U.S. Mail. Once again, the Debtor's own son became their "creditor". Of course, JGK Construction has made no efforts to actually enforce upon its Sydney Street Deed of Trust, which shields against other legitimate creditors from reaching the King Family primary residence.

158. True to form, the King Family utilized a similar scheme to protect against

Case No.
COMPLAINT

the Maui Vacation Condo located at 9 Puamelia Place, Unit 2, Lahaina, HI 96761, their valuable beachfront property. On February 26, 2009, the Debtors executed a deed of trust in favor of Carole's sister, Lana Lucas, for a $525,000 loan for the Maui Vacation Condo, recorded on May 22, 2009 (the "**Maui Vacation Condo Deed of Trust**"). These documents were prepared and distributed using interstate commerce, including the internet, email, and U.S. Mail. For the past sixteen years, Lucas has not requested or received any loan payments or made any other efforts to enforce the Maui Vacation Condo Deed of Trust. Carole's sister's deed of trust continues to encumber the equity of the Maui Vacation Condo from the reach of legitimate creditors.

159.  On June 10, 2022, JG formed Los Lobos and acquired the IFIC Judgment, repeating the strategy used for ORKA's acquisition of the Textron Judgments. The purpose was not repayment; it was protection. The IFIC Judgment was the only judgment secured by a perfected lien against the Maui Vacation Condo. By keeping that lien nominally "active," JG ensured that equity in the property remained untouchable by legitimate creditors of the Debtors. The fix was in – JG's acquisition of the IFIC judgment locked in its priority position, effectively walling off the condo from enforcement while maintaining the illusion of lawful creditor claims. So dubious was this transaction that IFIC required a full litigation indemnity from JG and his wife Nicole, which was substantiated by JG providing his full financial statements to IFIC before closing.

160.  While the details of all these transactions are different, their goal and effect are the same. Each of them used fraudulent documents, effectuated through the use of the internet, email, U.S. Mail, ACH transfers, and interstate wire transactions, to enact fabricated barriers to other creditors' enforcement rights. Each of them was directed by one or more members of the Enterprise. Each of them deceived and harmed the courts, the public (including tax authorities), and legitimate creditors like Plaintiffs. Most significantly, each of them furthered the primary and overriding purpose of the

39

Enterprise – prevent anyone and everyone (including but not limited to Plaintiffs) from accessing any of the assets of the Enterprise to collect the significant debts owed by the Debtors.

161.   This pattern demonstrates both *closed-ended continuity* – spanning more than a decade from at least 2009 through 2025 – and *open-ended continuity*, in that Defendants' conduct remains ongoing and continues to pose a threat of repetition. Plaintiffs therefore allege a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

### F.   The King Involuntary Bankruptcies

162.   After Wolverine acquired the EWB Judgment, it sought to conduct JDEs of the Debtors. To that end, Wolverine caused each of the Debtors (e.g. John and Carole) to be served with an Application and Order for Appearance and Examination ("**ORAP**") and a subpoena for the production of documents. The testimony and documents obtained in the JDEs form the factual foundation for the involuntary bankruptcy petitions and reveal the Debtors' pattern of concealing assets, diverting income through shell entities, and using insider-controlled companies to pay their personal expenses while claiming insolvency to evade legitimate creditor enforcement.

#### i.   *Foundational Testimony from JDEs*

163.   As to Carole, Wolverine never had an opportunity to examine her, as her attorneys from Glick Haupt Marino, LLP ("**GHM**") advised Wolverine's then-counsel, Spiwak & Iezza, LLP, that Carole had difficulty with short-term and long-term memory, was seeking treatment, and was not involved in John's business dealings, such that she would not be able to provide much useful information if examined. Based on these representations, rather than forcing Carole to appear for the JDE or seeking to have her examined by a medical professional to determine the extent of her cognitive issues, Wolverine agreed to forgo taking her JDE.

164.   Although Carole was not examined, she did produce various documents in

40

response to the subpoena served contemporaneously with the ORAP, including a few bank statements and credit card statements.

165.   As to John, on February 17, 2022, Wolverine conducted a JDE of John (the "**First JDE Session**") wherein he testified, under oath, that he was "retired" and that he was not in business for himself.

166.   On February 25, 2022, Wolverine conducted a JDE of John (the "**Second JDE Session**") wherein he testified, under oath, that King Ventures was not operational and that he has not "operate[d] it like that for a long time." Additionally, during the Second JDE Session, John testified as to the authenticity and accuracy of a financial statement dated December 31, 2021 (the "**King PFS**") that he produced to Wolverine in response to the subpoena served contemporaneously with the ORAP. Per the King PFS, John listed only $5,000 in "current debt (credit cards, accounts)" and more than $29 million in judgment liabilities.

167.   John further testified that he has his son, JG, use funds generated from other entities to pay "obligations on [his] behalf" and that John does not personally see any of the money. Furthermore, John testified that he spends $5,000-6,000 per month on personal needs using a credit card provided by Cliffs Resort. John testified that JG, through other entities, makes the mortgage and tax payments on the Debtors' primary residence.

168.   On March 22, 2022, Wolverine conducted a continued JDE of John (the "**Third JDE Session**") wherein he testified under oath that he was "retired" and had been retired for four or five years. John again confirmed that the $5,000 in debt, which included credit cards and accounts, was still an "accurate" number and encompassed all of his bills (i.e., "everything [he] had"). John yet again reiterated that, other than those liabilities enumerated in the King PFS, he had no other financial obligations.

169.   In addition to the King PFS, John also produced, among a few other things, a General Ledger captioned "King Properties" (the "General Ledger") that showed

41

various transfers of money between dozens of entities and payments to a multitude of creditors, though nothing in the General Ledger or any of the other documents produced by John indicated or otherwise identified who or what "King Properties" was or how the General Ledger reflected the Debtors' liabilities or creditors.

### ii.   *Obstruction During the Involuntary Bankruptcy Proceedings and Related Appeals*

170.   On August 31, 2022 (the "**Petition Date**"), based on thorough research and objective, reasonable analysis of the documents produced by the Debtors, coupled with John's sworn testimony during the three sessions of his JDE, Wolverine filed involuntary bankruptcy petitions in the United States Bankruptcy Court for the Central District of California: *In re John E. King*, case no. 9:22-bk-10674-RC (the "**John Bankruptcy Case**") and *In re Carole D. King*, case no. 9:22-bk-10673-RC) (the "**Carole Bankruptcy Case**") (collectively the "**Bankruptcy Cases**").

171.   The Enterprise responded by undertaking coordinated efforts to obstruct the disclosure, transparency, and cooperation that the federal bankruptcy process requires, all with the aim of impeding Wolverine's ability to identify and recover estate assets.

172.   On October 5, 2022, John and Carole filed motions to dismiss (the "**MTDs**") in their respective cases. Bankruptcy attorney William C. Beall ("**Beall**") filed identical declarations from John in support of the motions to dismiss (the "**MTD Declaration**") – in both John's case and in Carole's – even though Carole provided no declaration of her own and signed nothing herself. In the MTD Declaration, John identified in excess of forty creditors, many of which were listed as creditors of King Ventures, indicating that King Ventures was still operational, notwithstanding his sworn testimony months earlier that he was retired and that King Ventures had not been operational for "a long time." Additionally, despite listing only $5,000 in current debt in the King PFS and repeatedly confirming, under oath, that the PFS was accurate, John

claimed he had nearly $250,000 in current or recurring debt and that Carole's current or recurring debt was nearly $26,000.

173. Because 11 U.S.C. § 303(b) requires there be three petitioning creditors in cases where an alleged debtor has twelve or more creditors and John asserted more than forty creditors in his MTD Declaration, Wolverine contacted two other creditors disclosed in the MTD Declaration, ICW and Fence Factory, Inc. ("**FF**") and inquired about their willingness to join as petitioning creditors.

174. On or about May 12, 2023, both ICW and FF filed joinders to the involuntary petitions filed in the Bankruptcy Cases.

175. Given the stark disparities between John's sworn testimony in his JDE and the MTD Declaration, Wolverine served written discovery on John, Carole, the creditors listed in the MTD Declaration, and entities John and JG own and/or control.

176. Carole served no substantive responses to Wolverine's discovery requests nor produced any documents. Rather, in response to each and every written discovery request, the following statement was inserted: "Alleged Debtor has advanced stage Alzheimer's and is not sufficiently competent to respond. See Exhibit A attached hereto." The Exhibit A referred to in Carole's discovery responses is a letter dated April 5, 2022 (dated nearly two months after her JDE and five months before the Petition Date) from Carole's doctor who advised that she "has been diagnosed with Alzheimer's disease and that *it would not be in her or others best interest* to have her participate in a legal deposition" [emphasis added]. As with her MTD, John signed Carole's responses to Requests for Admission on her behalf; Beall signed Carole's responses to the Requests for Production as "Counsel for Alleged Debtor."

177. In response to the discovery requests served upon John, he asserted, among other things, various boilerplate objections, and he produced very few documents. Critically, however, he admitted that he was merely "semi-retired." In other words, John committed perjury in his JDE testimony.

43

Case No.
COMPLAINT

178.   In addition to the defective and deficient discovery responses, to prevent Wolverine from obtaining any information regarding the true nature of his assets and/or liabilities or the identity of his personal creditors, John filed a motion to quash virtually every subpoena issued by Wolverine (the "**MTQ**"). Additionally, each of the entities owned and/or controlled by John and/or JG upon whom subpoenas were served, filed substantially identical objections to the subpoenas and/or filed a joinder to the **MTQ**. John's state-court counsel, Glick Haupt Marino, LLP ("**GHM**"), filed the objections and joinders on behalf of forty-one of the subpoenaed business entities; Farmer & Ready, a Law Corporation ("**F&R**"), filed objections and joinders on behalf of five of the subpoenaed business entities, including DRI.

179.   A hearing on the MTQ was conducted on September 27, 2023, less than one week before the evidentiary hearing on both MTDs. Although the court entered an order denying the MTQ as to every subpoena (except for one), none of the entities owned and/or controlled by John or JG produced any documents. Moreover, a handful of third parties such as MCB also failed to produce any documents, notwithstanding the fact that MCB never served objections to the subpoena served upon it or filed a joinder to the MTQ.

180.   On October 3, 2023, the Court conducted the evidentiary hearings on both MTDs. John appeared on behalf of himself and Carole and testified that he did not prepare the list of creditors attached as an exhibit to his MTD Declaration, which formed the basis for his and Carole's MTDs.

181.   On January 8, 2024, the court granted both MTDs and dismissed the Bankruptcy Cases (each a "**Dismissal Order**" and, collectively, the "**Dismissal Orders**"), which Wolverine appealed to the Bankruptcy Appellate Panel for the Ninth Circuit ("**BAP**").

182.   On or about April 4, 2024, the John and Carole each filed motions for damages (each a "**Damages Motion**" and, collectively, the "**Damages Motions**"),

44

seeking compensatory and punitive damages against Wolverine for filing the Bankruptcy Cases.

183. Wolverine deposed John on or about July 17, 2024, related to issues under the Damages Motions. John testified that he was "quasi-retired"; that despite bills being issued to King Ventures, the actual obligors on many of those bills were the entities that received the goods or services – an admission that the forty-plus creditors listed on the MTD were a fabrication; and that part of the "damages" he was seeking to recover from Wolverine were the attorneys' fees billed by GHM for its work preparing forty-one business entities' subpoena objections and MTQ joinders, and John was unable to articulate how either he or Carole were personally obligated for the legal fees of such business entities. In other words, Wolverine relied on John's JDE testimony in filing the petitions in the Bankruptcy Cases, John and Carole responded by filing MTDs pursuant to 11 U.S.C. § 303(b) to defeat those petitions – knowingly lying to the bankruptcy court as to the validity of their scheduled debts – and are now seeking damages and recovery of legal fees against Wolverine and the other petitioning creditors.

184. Remarkably, during the pendency of the Damages Motions, John **and** Carole jointly entered into two settlement agreements – one with EWB and the other with ICW – to resolve their claims for damages against EWB and ICW in connection with the dismissals of the Bankruptcy Cases. Notwithstanding Beall's repeated representations to the court that Carole was incapacitated and unable to respond to discovery or testify at the MTQ evidentiary hearing, and the fact that she never signed a single declaration in either Bankruptcy Case, Carole **personally signed** both settlement agreements, as did Beall.

185. On October 29, 2024, the BAP issued an opinion reversing the Dismissal Order entered in the John Bankruptcy Case and affirmed the Dismissal order entered in the Carole Bankruptcy Case. As a result, the Damages Motion filed in the John

45

Bankruptcy Case was denied. Because the Dismissal Order in the Carole Bankruptcy Case was not reversed, the bankruptcy court set an evidentiary hearing on Carole's Damages Motion for March 19, 2025.

186.   Carole did not testify at the evidentiary hearing for her Damages Motion. Rather, John testified on Carole's behalf, as did her purported bankruptcy counsel, Beall, of Beall & Burkhardt, APC ("**B&B**"). During the evidentiary hearing, both John and Beall testified that John was, from the outset of the Carole Bankruptcy Case – including the filing of her MTD) – acting on Carole's behalf pursuant to a purported durable power of attorney ("**DPOA**") allegedly in effect as of the Petition Date. However, no such DPOA was ever produced prior to the hearing. Additionally, when questioned about his authority to represent Carole in the Carole Bankruptcy Case, Beall testified that notwithstanding the alleged existence of the DPOA, Carole signed the engagement agreement retaining B&B as her bankruptcy counsel. Notwithstanding his testimony affirming the existence of that engagement agreement, Beall has refused to produce it.

### iii.   *Coordinated Insider Communications and Unified Litigation Strategy*

187.   Documents filed during Carole's Damages Motion exposed the extent of the coordinated conduct among the Debtors, their state court counsel at GHM, their bankruptcy counsel at B&B, MCB (a key banking/lending institution for the King Enterprise), JG, and employees of DRI, an entity wholly owned and controlled by JG. These communications and documents confirm that the Debtors and their affiliates operated collectively as a single enterprise to conceal assets, evade creditor enforcement, and manipulate judicial proceedings. The most significant disclosures came from GHM itself. On August 1, 2024, Beall filed a Supplemental Declaration of John E. King submitted in support of Carole's Damages Motion containing unredacted GHM legal invoices detailing its involvement during the period immediately following

the dismissal of the Bankruptcy Cases. These billing entries reveal extensive behind-the-scenes coordination between GHM partner Fred Glick ("**Glick**"), GHM partner Michael Haupt ("**Haupt**"), GHM attorney Lisa Hamon ("**Hamon**"), and Metchik, as counsel for AKRO and ORKA and therefore adverse to John and Carole in unrelated matters.

188.    According to GHM's billing records, on January 8, 2024, the day the Bankruptcy Cases were dismissed, GHM attorneys held multiple strategy conferences with Metchik and with Glick concerning the foreclosures of 250 Avila Beach Drive and 6900 Ontario Road (the only properties held by John and Carole which were subject to active writs of execution at the time). They discussed timing requirements, coordinated next steps, and prepared to act immediately after the dismissal of the automatic stay. On January 10, 2024, Metchik placed the legal notices of sale in the San Luis Obispo Tribune, initiating the statutory publication period for foreclosure. The very same GHM attorneys representing John and Carole in their state court cases continued coordinating foreclosures of their properties with Metchik in the weeks that followed.

189.    As previously discussed, the United States Marshal conducted foreclosure sales of 250 Avila Beach Drive and 6900 Ontario Road. AKRO, an entity owned by JG, purchased both properties, each for a credit bid of $6,000. Although the sales occurred in early February 2024, the Marshal's Deeds were not recorded until November 21, 2025, more than twenty-one months after the sales.

190.    Discovery produced by Beall confirms that the Debtors, their family members, their affiliated entities, and their attorneys do not operate independently. Instead, they act as a coordinated litigation unit that shares information, strategy, and objectives across multiple forums. Emails among counsel for the Debtors, counsel for JG, counsel for the insider entities ORKA and AKRO, counsel for affiliated hotel and resort entities, and third-party actors show a unified flow of confidential and strategic information. The communications demonstrate that the Enterprise does not maintain

47

any meaningful separation among the individuals and entities it uses to shield assets and obstruct creditors.

191. The following representative communications illustrate the coordinated nature of the Enterprise's litigation efforts. The emails are arranged in chronological order to demonstrate the progression of unified strategy over time.

**September 11, 2024**
Email exchange from JG to DRI employees, John, and attorneys at B&B notifying them of Wolverine's proposed settlement discussion, stating "I'm not sure we will reach out again unless Will thinks we should hear him out." *See* **Exhibit 12**. At the time of JG's email to John and Carole's bankruptcy counsel and others, the Bankruptcy Cases were dismissed. Beall does not represent JG, nor does he represent John and Carole in state court matters related to the EWB Judgment.

**October 2, 2024**
Email from JG to Beall, Metchik and Ready: "Gentlemen…Can we get your thoughts and how we (AKRO) might get into pole position, ahead of all others?" *See* **Exhibit 13**.

**October 11, 2024**
Hamon emails John, JG, multiple DRI employees, Haupt, and Ready with an update on the prior day's San Luis Obispo Superior Court hearing regarding motions to quash subpoenas served by Wolverine. She warns that "there is a significant chance [Judge van Rooyen] may deny [Debtors'] ex parte application," and explains that she is copying Ready because disclosure of the subpoenaed documents would likely impact Wolverine's pending third-party examination of JG. *See* **Exhibit 14**.

Moments later, JG forwards the email to Beall, stating: "***We*** definitely need a more aggressive attorney, should you think of one." [emphasis added]. *Id.*

This exchange is remarkable. JG is asking his parents' bankruptcy counsel to help locate an attorney who can more effectively shield his parents' assets from legitimate creditors, despite his very ownership of AKRO and Los Lobos. His use of "we" further underscores that he views himself, his parents, and their affiliated entities as a unified front working toward a shared objective: King Family asset protection.

48

**January 6, 2025**

Haupt emails Ready, Metchik, John, JG, DRI employees, Beall, Hamon, Glick, and attorney Gayne Kalustian-Carrier ("**Kalustian-Carrier**") to circulate a copy of the fraudulent conveyance action that ICW filed on December 20, 2024, naming Rossi, JG, Carole, Los Lobos, AKRO, and ORKA as defendants. *See* **Exhibit 15**. The distribution list again includes counsel for the Debtors, counsel for insider entities, operational employees, and attorneys who claim to represent adverse interests, demonstrating the integrated and coordinated nature of the Enterprise's response to creditor actions.

**February 27, 2025**

JG emails John and Carole's appellate counsel, Herb Fox, along with DRI employee Steve Tulcus, Beall, John and Carole's new appellate attorney, Neil Tardiff: "*We all felt* you would be best to continue representing us in my Father's case." [emphasis added]. *See* **Exhibit 16**. JG's explicit use of "we" once again implies that he considers himself, his parents, and their attorneys to be working collectively toward a shared objective, without regard for any formal separation of legal representation and business interests.

192.    These communications and billing records establish that the Debtors, their family members, their affiliated entities, their various counsel, and even a third-party financial institution operated in concert with the shared objective of shielding assets, manipulating creditor rights, and impeding lawful discovery. The factual record confirms a network of actors who coordinated legal strategy, foreclosures, asset transfers, and obstruction of enforcement efforts across multiple forums.

   *iv.* ***Revelations from Subpoena Production Related to the Damages Motions***

193.    In November 2025, MCB produced certain documents responsive to Wolverine's subpoena efforts – efforts dating back to validly served subpoenas in 2022, 2023 and 2024 under the Bankruptcy cases and Wolverine's state-court enforcement efforts against the Debtors.

194.    Shortly after the foreclosure sales, on February 13, 2024, John emailed the president of MCB, the lender for 250 Avila Beach Drive, advising the bank that JG had

49

foreclosed on his interest in the property, as referenced in paragraph 9 of this Complaint. In that email, John effectively disclosed the overarching scheme: that nothing regarding the operations or revenue flows of the property would change and that JG would continue to make the loan payments. In the same communication, John sent MCB a copy of JG's password-protected personal financial statement as supposed proof of continued stability. The fact that John possessed and circulated his creditor's password-protected financial statement further underscores the shared control and absence of boundaries between these individuals and entities.

195.   MCB's communications further demonstrate the integrated nature of the Enterprise. Employees of DRI, including senior personnel, communicated directly with MCB to prevent the bank from responding to subpoenas issued by Wolverine in the Bankruptcy Cases. These efforts were coordinated not only with John and JG but also with GHM attorneys representing the Debtors in unrelated state court enforcement proceedings. MCB in turn appeared to align itself with the Debtors, indicating a willingness to protect John by refusing to produce documents, notwithstanding having been properly served and having filed no objections.

196.   The evidence obtained through the JDEs, the Bankruptcy Cases, the Damages Motions, and the late-produced subpoena materials reveals a deliberate, coordinated pattern of conduct. Across multiple forums, the Debtors, their family members, their affiliated entities, their counsel, and third-party institutions such as MCB, worked collectively to conceal assets, obstruct creditor rights, manipulate judicial processes, and preserve control over revenue-generating properties. The Bankruptcy Cases did not expose isolated inconsistencies or discrete acts of noncompliance. They revealed an integrated network operating with a unified objective: to keep assets beyond the reach of lawful enforcement while presenting a façade of insolvency. The conduct at issue was not inadvertent or fragmented. It was coordinated, deliberate, and central to the Enterprise's ongoing scheme.

## G.   The Dissolved A.J. Spurs Corporation as a Secret Conduit for the Debtors' Living Expenses

197.   Another mechanism the Enterprise has employed for more than thirteen years to conceal income and pay the Debtors' personal living expenses, is the bank account of the long-dissolved corporation, A.J. Spurs.

198.   A.J. Spurs was incorporated on March 12, 1990, by JG, along with Alan Grimley, and James J. Walsh. JG personally executed and filed the corporation's Certificate of Dissolution with the California Secretary of State on March 2, 2012, certifying under penalty of perjury that the corporation had been completely wound up and its known assets distributed.

199.   Notwithstanding that dissolution, JG has continued to maintain and actively use A.J. Spurs' pre-existing checking account at Pacific Western Bank (account ending ×1299) as a clandestine funding source for John and Carole.

200.   From 2012 through at least 2021, JG caused checks to be drawn on the A.J. Spurs account payable to "Chase Card Services" and other creditors for the direct personal benefit of the Debtors. Representative examples include, but are not limited to:

| Check No. | Date | Amount | Payee |
|---|---|---|---|
| 1022 | April 6, 2018 | $1,726.64 | Chase Card Services |
| 1026 | June 4, 2018 | $2,641.32 | Chase Card Services |
| 1051 | April 2, 2019 | $1,808.26 | Chase Card Services |
| 1061 | July 3, 2019 | $7,538.92 | Chase Card Services |
| 1092 | June 2, 2020 | $1,832.05 | Chase Card Services |
| 1124 | June 1, 2021 | $6,334.57 | Chase Card Services |
| 1134 | July 2, 2021 | $1,982.30 | Chase Card Services |
| 1144 | September 2, 2021 | $2,787.40 | Chase Card Services |
| 1147 | October 4, 2021 | $1,839.84 | Chase Card Services |

51

201.   Many of these post-dissolution checks were filled out in the distinctive handwriting of Carole and bear the personal signature of JG, confirming that the Debtors themselves actively participated in using the dissolved corporation's account to conceal funds and pay their personal expenses in furtherance of the Enterprise's scheme. *See, e.g.*, Checks Nos. 1022, 1026, 1051, 1061, attached as **Exhibit 17**.

202.   These payments were made years after any conceivable winding-up period for A.J. Spurs had expired. Under California Corporations Code § 2010, a dissolved corporation continues to exist only for the limited purpose of winding up its affairs. Paying recurring personal living expenses of the Debtors is not a winding-up activity; it is the transaction of new, unauthorized business.

203.   Each post-dissolution check drawn on the A.J. Spurs bank account, and each electronic presentment and clearing of those checks through interstate wires, constitutes a separate act of wire fraud (18 U.S.C. § 1343) and/or mail fraud (18 U.S.C. § 1341) in furtherance of the Enterprise's scheme to shield income streams and assets.

204.   A.J. Spurs lacks capacity to appear or defend this action. Any allegations against it will therefore be taken as admitted upon default. JG, as the individual who has exercised exclusive dominion and control over the dissolved corporation and directed its ultra vires acts, is personally liable for its conduct under principles of agency and alter ego.

**H.   <u>The Enterprise Continues Its Illegal Scheme Today, Causing Tens of Millions of Dollars of Harm to Plaintiffs</u>**

205.   Plaintiffs have been harmed by the inability to collect on their judgments. Specifically, Plaintiffs suffered damages and injury to their property, including without limitation: (a) impairment to the ICW Judgment and the EWB Judgment; (b) decreased value of the assets available to be levied upon as a result of Defendants' diversion, delay and interference; (c) losses attributable to Defendants' fraudulent transfers and sham foreclosures; (d) delay and loss in the use, enjoyment, benefits, profits, revenues,

interest, and opportunities to execute on and recover against the property that was fraudulently transferred and/or encumbered; (e) waste, loss, plunder, and devaluation of the assets during the period of delay and interference; and (f) years of staggering attorneys' fees and costs incurred by Plaintiffs as a direct consequence of Defendants' interference.

206. Moreover, if this scheme is not stopped, Plaintiffs will continue to be precluded from collecting altogether – rendering their judgments worthless.

207. Were it not for this scheme, Plaintiffs could have taken extensive collection efforts, like those undertaken by Textron, and would have successfully levied upon and collected from the shielded assets long ago.

## I.     The Enterprise Is A RICO Organization and Conspiracy

208. The Enterprise is an association-in-fact enterprise. It consists of Defendants John, Carole, JG, Lucas, Metchik, Nelson, Rossi, AKRO, ORKA, 1023 Monterey, 1035 Monterey, A.J. Spurs, Addie Street, Apple Farm, Black Chaps, Boutique, Cliffs, DRI, Fernwood, JGK Construction, the John and Carole King Family Trust, Los Lobos, Mission Grove, Montalban, the Robin L. Rossi Living Trust, Spanish Vineyards, Sycamore, SeaVenture, and The Vineyards at Spanish Springs, and other entities used and controlled by members of the Enterprise. See *United States v. Boyle*, 556 U.S. 938 (2009). Each of the members of the Enterprise has agreed with the other to take certain actions to benefit the Enterprise and achieve its purpose, as described in detail herein.

209. Defendants have repeatedly admitted under oath that a central purpose of the Enterprise is to preserve the King Family's wealth for the benefit and eventual inheritance of JG while simultaneously preventing Plaintiffs from ever collecting their judgments.

210. John testified: "I mean, when you look at this thing closely, you realize that [JG] is the heir apparent for anything Carole and I own." (John Bankruptcy Case

Case No.
COMPLAINT

Debtor's Exam of John E. King, Jan. 6, 2021, 67:14-16).

211. John supplemented that statement by testifying JG is involved in the scheme "to protect his - whatever equity he has in some of these properties." (John Bankruptcy Case Debtor's Exam of John E. King, Feb. 17, 2022, 84:7-9).

212. When asked why he formed ORKA, JG testified that it was to protect not only the properties affiliated with the Textron Satisfaction Agreement, but "plus any other properties that I might someday inherit." (John Bankruptcy Case Third-Party Exam of John G. King, Sept. 26, 2024, 16:7-13).

213. John has even testified in the Second JDE Session that he has no intent of ever paying the EWB Judgment now held by Wolverine: "I don't intend on ever paying it." (Judgment Debtor Examination of John E. King, Feb. 25, 2022, 258:28).

214. The members of the Enterprise all share a common purpose of shielding the assets of the King Family, primarily the Debtors, from collection efforts by Plaintiffs (and potentially other creditors). The goal of this Enterprise is, put simply, to keep these assets in the family (e.g., within the Enterprise) while still allowing members of the Enterprise (including John and Carole) to use and benefit from these assets. Each member of the Enterprise has a relationship with the others because they are family members (John, JG, Carole, and Lucas), business associates (Metchik, Rossi, and Nelson) or entities controlled by members of the Enterprise acting for the benefit of the Enterprise (AKRO, ORKA, and others). This scheme is long running, beginning more than a decade ago and continuing through today.

215. The scheme alleged herein relied extensively on the use of interstate wires. Most property transfers made used the internet or mail, which is a use of interstate commerce. Most or all communications in furtherance of the scheme used email, or phone calls, another use of interstate commerce. Many of the fraudulent property records or court filings also used the internet, another use of interstate commerce. And many of the payments in furtherance of this scheme were made by wire transfer, another

54

use of interstate commerce. *See, e.g., Barnes v. Crown Jewels, LLC*, No. 2:14-cv-04098-ODW(MRWx), 2014 U.S. Dist. LEXIS 141177, at *7-8 n.4 (C.D. Cal. Oct. 1, 2014).

216.   This pattern of racketeering activity has both open-ended and closed ended continuity. It has open-ended continuity because the threat of harm from the scheme is ongoing, continues to this day, and will continue indefinitely unless and until stopped by the Court or law enforcement. *See UTHE Tech. Corp. v. Allen*, 2016 U.S. Dist. LEXIS 49222, at *5 (N.D. Cal. Apr. 12, 2016). There is also closed ended continuity because, even if the scheme were stopped, it has run for more than a decade, such that it has significant longevity. *See Kearney v. Foley & Lardner, LLP*, 607 F. App'x 757, 758 (9th Cir. 2015).

217.   Despite the fact that this conspiracy dates back years, this action is timely for several reasons. First, and most directly, the criminal acts and the related harm continue to this day. By way of example, recent activity includes: (a) the Complicit Entities paid a combined $1.6 million to cover John's 2021 taxes; (b) Metchik placed public notices in *The Tribune,* a San Luis Obispo newspaper, announcing planned U.S. Marshal's sales of the King Family's interests in eight acres of vacant land at 6900 Ontario Road and the Avila Hot Springs property located at 250 Avila Beach Drive, and did actually foreclose on those properties on February 7, 2024 and concealed the foreclosures until he recorded the U.S. Marshal's Deeds more than twenty-one months later on November 21, 2025; and (c) AKRO filed ex parte applications to extend the improperly-obtained ORAP liens on John's personal property on January 30, 2024 and again on August 18, 2025. Each of these illegal acts in furtherance of the RICO conspiracy renews the statute of limitations. *See Grimmett v. Brown*, 75 F.3d 506, 512 (9th Cir. 1996). Second, and in any event, many of the criminal acts herein were kept secret from Plaintiffs and others, which is unsurprising due to their fraudulent and criminal nature. This fraudulent concealment and delayed discovery of the wrongdoing

provide further support for extending the statute of limitations. *See id.* At 514.

218.   Based on the foregoing facts, and the extensive additional evidence which will be produced at trial, Plaintiffs bring these claims for violation of the RICO statute and conspiracy to violate RICO.

## FIRST CLAIM FOR RELIEF

### (Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) — Against all Defendants)

219.   Plaintiffs reallege and incorporate herein by reference each and every allegation set forth in paragraphs 1 through 218, inclusive, as set forth above.

220.   The Members of the Enterprise[9] are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) because each Defendant is capable of holding, and does hold, "a legal or beneficial interest in property."

221.   Defendants' conduct constitutes a "pattern" of racketeering activity under 18 U.S.C. § 1961(5) because their activities include at least two acts of racketeering activities in the past 10 years, including, but not limited to, the following acts:

a. John is the architect and ultimate decision-maker of the scheme. He willfully directed Rossi and JG to form ORKA instead of satisfying the Textron Judgments, instructed that the final $600,000 payment be used to purchase rather than extinguish the Textron Judgments, approved the inflation of those judgment balances, personally benefited from the continued use of shielded properties (including the Fremont Theater, Apple Farm Inn, and the family's primary residence and Maui Vacation Condo), and has openly stated under oath that he does not intend to pay the

[9] The Members of the Enterprise, as alleged throughout Plaintiffs' First and Second Causes of Action, consist of: John, Carole, JG, Lucas, Metchik, Nelson, Rossi, AKRO, ORKA, 1023 Monterey, 1035 Monterey, A.J. Spurs, Addie Street, Apple Farm, Black Chaps, Boutique, Cliffs, DRI, Fernwood, Higuera, JGK Construction, the John and Carole King Family Trust, Los Lobos, Mission Grove, Montalban, the Robin L. Rossi Living Trust, Spanish Vineyards, Sycamore, SeaVenture, and The Vineyards at Spanish Springs.

judgments Plaintiffs hold. Moreover, he knowingly made fraudulent misrepresentations and omissions in testimony before the Bankruptcy Court for the Central District of California throughout the Bankruptcy Cases in order to obstruct Plaintiffs collection of the rightfully owed funds;

b. Carole participated in and benefited from the scheme by jointly owning and controlling the shielded assets with John, consenting to and executing fraudulent liens and transfers that encumber community and trust property, knowingly receiving hundreds of thousands of dollars in personal financial benefits from entity defendants that paid the Debtors' living expenses in deliberate violation of this Court's charging and assignment orders. She willfully prepared dozens of post-dissolution checks drawn on the bank account of the dissolved A.J. Spurs, Inc. (Pacific Western Bank account ending ×1222) – checks written in her own handwriting – to pay the Debtors' recurring household bills, credit-card charges, and other personal expenses, thereby concealing income and assets from legitimate creditors and committing repeated acts of mail and wire fraud each time those checks were mailed or electronically cleared;

c. JG formed, owns, and controls ORKA, AKRO, Los Lobos, and JGK Construction; willfully capitalized ORKA for the final $600,000 payment to Textron; willfully directed which properties ORKA and AKRO would "foreclose" upon using the fraudulently maintained Textron Judgments (including the Fremont Theater in 2017 and the Apple Farm Inn in 2019); knowingly acquired the IFIC Judgment through Los Lobos to maintain a sham senior lien on the Maui Vacation Condo; and willfully accepted the June 30, 2025 assignment of the $4.2 million Sydney Street Deed of Trust from Nelson to JGK Construction in order to continue shielding the Debtors' primary residence; and, for more than thirteen years after

personally dissolving A.J. Spurs, Inc. in 2012, he knowingly continued to sign dozens and dozens of checks drawn on its bank account – many prepared in Carole's handwriting – to pay his parents' recurring personal living expenses, thereby concealing income from creditors and committing repeated acts of mail and wire fraud;

d. JG knowingly controls the funds flowing through all of the Complicit Entities, willfully ignores the 2012 Charging and Assignment Orders and the 2022 Charging Order by paying for the lives of his debtors, and knowingly refuses to apply credits to the Textron Judgments, leaving overly inflated balances (to the extent they weren't fully satisfied ORKA's purchase) in this Court's records.

e. Rossi co-formed and co-owns ORKA and AKRO with JG; willfully signed the June 5, 2020 assignments transferring the Textron Judgments from ORKA to AKRO for no consideration; knowingly participated in the decision to capitalize ORKA with the final $600,000 Textron payment instead of satisfying the judgments; and, as 50% co-owner (through his entity, Santa Barbara-Pacific LLC) of the 2015 Monterey Street commercial property, knowingly caused ORKA – the entity he jointly controls with JG – to execute a sham U.S. Marshal foreclosure sale in 2018 that stripped the Debtors of their 50% interest for a $6,000 credit bid while leaving Rossi's own 50% interest untouched. Thereafter, despite being a borrower and guarantor under the loan, Rossi contributed nothing toward the $87,481.87 monthly mortgage payments from April 2019 through March 2020 (all of which were made by John), confirming that Rossi knowingly and willfully lent his co-ownership interest to the fraudulent scheme so the Debtors could continue enjoying 100% economic benefit of the property free from legitimate creditors;

58

f.  Metchik, as counsel and registered agent for ORKA and AKRO, knowingly prepared, signed, and electronically filed via CM/ECF numerous documents containing material falsehoods, including but not limited to: affidavits and applications for writs of execution that grossly inflated the balances of the Textron Judgments; the December 19, 2019 renewal of the Textron Judgments for a combined $6,307,796.76; motions and proposed charging orders; and the state-court ORAP examination application that created and extended a sham lien against all of John's personal property through March 2026, all with knowledge that these filings were being used to hinder, delay, and defraud legitimate creditors. He further willfully authored and used the Court's CM/ECF system to electronically file multiple fraudulent judgment renewals, writ applications, and charging order motions, and knowingly included false representations overstating the Textron judgment balances as exceeding $6 million (when the debt had been fully satisfied) and concealed his own and his client's insider status from the Court;

g.  ORKA and AKRO, as the primary sham creditors, acquired the Textron Judgments for the express purpose of preventing their satisfaction, used fraudulently inflated balances to obtain writs of execution and to credit-bid $6,000 each for the Fremont Theater and Apple Farm Inn properties, subsequently conveying the Fremont Theater parcels to newly formed entities (1023 Monterey and 1035 Monterey) while retaining Apple Farm in ORKA; intervened in enforcement proceedings brought by Plaintiffs; and used the same sham foreclosure process to Acquire Avila Hot Springs and 6900 Ontario through AKRO. ORKA, AKRO, 1023 Monterey and 1035 Monterey, each an entity controlled by the Enterprise, continue to hold these properties and continue to assert senior priority over Plaintiffs'

59

judgment liens;

h. Los Lobos, formed and controlled by JG, acquired the IFIC Judgment in 2022 for the sole purpose of maintaining a sham senior lien against the Maui Vacation Condo and preventing Plaintiffs from reaching equity in that property;

i. JGK Construction, formed and controlled by JG, accepted the June 30, 2025, assignment of the $4.2 million deed of trust encumbering the Debtors' Sydney Street Residence, for no consideration and continues to hold that lien without any effort to enforce it, thereby shielding the property from legitimate creditors;

j. Nelson, a longtime insider, knowingly held the $4.2 million deed of trust on the Debtors' primary residence from 2012 to 2025 without ever demanding or receiving a single payment, then assigned it to JG's JGK Construction LLC on June 30, 2025, all for the purpose of keeping the property beyond the reach of creditors;

k. Lucas, Carole's sister, has knowingly held a $525,000 deed of trust on the Maui Vacation Condo since 2009 without ever demanding or receiving payment, thereby maintaining a fraudulent encumbrance that blocks Plaintiffs and other legitimate creditors from reaching the equity in that property;

l. A.J. Spurs, although formally dissolved in 2012, continued to be operated and controlled by JG and Carole as an instrument of the Enterprise. From at least 2012 through the present, Carole willfully prepared, and JG willfully signed, checks drawn on A.J. Spurs' Pacific Western Bank account (ending ×1222) to pay personal living expenses and household bills of the Debtors rather than routing those funds through their personal bank accounts. By continuing to operate financially through the bank

60

account of a dissolved corporation and directing payments in this manner, A.J. Spurs functioned as a concealed revenue stream kept outside ordinary income reporting channels and thereby helped the Debtors avoid triggering the $200,000 annual income cap under the Textron Satisfaction Agreement; and

m. The remaining entity defendants – including but not limited to Addie Street, Apple Farm, Black Chaps, Boutique, Cliffs, DRI, Fernwood, Higuera, Mission Grove, Montalban, Spanish Vineyards, Sycamore, SeaVenture, The Vineyards at Spanish Springs, and the various family and living trusts – participated in the operation or management of the Enterprise by (i) serving as repositories for fraudulently transferred or shielded assets, (ii) making payments for the Debtors' personal living expenses, taxes, and obligations in deliberate violation of this Court's charging and assignment orders, and/or (iii) transferring funds or interests at the direction of John, JG, or Rossi, all for the purpose of hindering, delaying, and defrauding Plaintiffs.

222. A true and correct copy of Plaintiffs' organizational and flow-of-scheme diagram, illustrating the structure of the Enterprise, the Complicit Entities, and the flow of assets, liens, and sham enforcement rights underlying the scheme, is attached hereto as **Exhibit 18**.

223. The Members of the Enterprise (or any subset thereof) constituted an "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(c), in that they were "a group of individuals associated in fact" for the common purpose of intentionally and willfully defrauding Plaintiffs and this Court through a scheme to fraudulently maintain judgments, liens, and enforcement orders to encumber the assets of the Debtors and prevent Plaintiffs from recovering their judgment.

224. All Defendants agreed to and did conduct and participate in the conduct of

the Enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding Plaintiffs.

225.   Defendants' racketeering acts consisted of, but are not limited to, multiple acts of mail or wire fraud. Additionally, Defendants have engaged in obstruction of justice and made numerous false statements of facts and law in courts of various jurisdictions as outlined above. All of Defendants' acts were committed for the unlawful purpose of intentionally defrauding Plaintiffs and furthering the interests of the Enterprise. As explained in detail above, the Defendants coordinated their activities, shared critical information and documents that support their enterprise, and acted in concert to further the interests of the Enterprise.

226.   All of the acts of racketeering described herein were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. §1962(c), in that their common purpose was to further the interests of the Debtors, hide funds and assets of the Enterprise, and deny and defraud their victims, including Plaintiff, of money and property. Their common result and goal was to defraud Plaintiffs of money and property and/or to place the Debtors' assets beyond the reach of Plaintiffs and this Court; the Members of the Enterprise through their employees, members, or agents, directly or indirectly, participated in the acts and employed the same or similar methods of commission; Plaintiffs were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

227.   As a direct and foreseeable consequence – and in direct relation to – the predicate acts described herein, and as a direct and proximate result of, and by reason of, the activities of the Members of the Enterprise and their conduct in violation of 18 U.S.C. §1962(c), Plaintiffs were injured in their respective business or property, within the meaning of 18 U.S.C. §1964(c). Among other things, Plaintiffs suffered damages and injury to their property, including specifically damage to the EWB Judgment and

62

the ICW Judgment, including without limitation the decreased value of the assets to be levied upon caused by Defendants' delay and interference; damages from Defendants' fraudulent transfers; delay and loss in the use, enjoyment, benefits, profits, revenues, interest and interests and delay and loss of opportunity to execute on and recover against the property fraudulently transferred and/or encumbered resulting from the delay and interference; damage caused by waste, loss, plunder, and devaluation of the assets committed by Defendants during the delay and interference; damages in the form of attorneys' fees and costs resulting from the interference, including attorneys' fees incurred in various courts in California, and costs incurred in addressing the fraudulent conduct in litigation; and all other damages, injuries, and harms caused by the fraudulent transfers and interference. Plaintiffs are, therefore, entitled to recover threefold the damages Plaintiffs sustained together with the cost of the suit, reasonable attorneys' fees and reasonable experts' fees.

228. Plaintiffs therefore demand judgment against each and every member of the Enterprise, jointly and severally, for the following: treble damages pursuant to 18 U.S.C. §1964(c); attorneys' fees and costs pursuant to 18 U.S.C. §1964(c); and such other and further relief as this Court may deem just and proper.

## SECOND CLAIM FOR RELIEF

### (Civil RICO Conspiracy – 18 U.S.C. § 1962(d) – Against all Defendants)

229. Plaintiffs reallege and incorporate herein by reference each and every allegation set forth in paragraphs 1 through 228, inclusive, as set forth above.

230. As alleged in First Claim for Relief, one or more of the Members of the Enterprise violated 18 U.S.C. § 1962(c). Any person(s) who is found to have violated 18 U.S.C. § 1962(c) is hereafter referred to as the "Operator / Manager" for the remainder of this First Claim for Relief.

231. The Members of the Enterprise conspired with the Operator(s)/Manager(s) to conduct or participate, directly or indirectly, in the conduct of the affairs of the

63

Case No.
COMPLAINT

Enterprise, defined *supra*, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

232. In particular, the Members of the Enterprise intended to or agreed to further an endeavor of the Operator(s)/Manager(s) which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor. Defendants' conduct includes, but is not limited to:

   a. The Debtors paying the $600,000 Satisfaction Amount but refusing to acknowledge satisfaction of the Textron Judgments, and instead becoming their own sham creditors;

   b. Levying and executing their own commercial properties, worth tens of millions of dollars, for pennies on the dollar while simultaneously removing those valuable assets out of the Debtors' names;

   c. JGK controlling both Textron Judgments and all associated liens, violating all of this Court's charging and assignment orders, paying millions of dollars out of the Complicit Entities for the benefit of the Debtors, without crediting any payments to either judgment;

   d. Initiating sham lawsuits against themselves and manipulating state courts into unknowingly creating sham liens, such as AKRO's senior ORAP lien against all personal property of John, which precludes Plaintiffs from levying against any personal property of John; and

   e. Manipulating federal courts into unknowingly issuing additional enforcement orders in favor of AKRO, such as the 2022 Charging Order.

233. Plaintiffs were injured by the Members of the Enterprise by overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which included (among other acts) acts of wire fraud, mail fraud, and obstruction of justice committed through the Enterprise alleged in First Claim for Relief.

234. As a direct and proximate result of, and by reason of, the activities of the Members of the Enterprise and their conduct in violation of 18 U.S.C. §1962(d), Plaintiffs were injured in their respective business or property, within the meaning of 18 U.S.C. §1964(c). Among other things, Plaintiffs suffered damages, i.e., damages for the fraudulent transfers; decreased value of the assets to be levied upon caused by the delay and interference; delay and loss in the use, enjoyment, benefits, profits, revenues, interest and interests and delay and loss of opportunity to execute on and recover against the property fraudulently transferred and/or encumbered resulting from the delay and interference; damage caused by waste, loss, plunder, and devaluation of the assets committed by Defendants during the delay and interference; attorneys' fees and costs resulting from the interference, all other damages, injuries, and harms caused by the fraudulent actions and interference. Plaintiffs are therefore, entitled to recover threefold the damages Plaintiffs sustained together with the cost of the suit, reasonable attorneys' fees and reasonable experts' fees.

235. Plaintiffs therefore demand judgment against each and every member of the Enterprise, jointly and severally, for the following: treble damages pursuant to 18 U.S.C. §1964(c); attorneys' fees and costs pursuant to 18 U.S.C. §1964(c); and such other and further relief as this Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a judgment against John, Carole, JG, Lucas, Metchik, Nelson, Rossi, AKRO, ORKA, 1023 Monterey, 1035 Monterey, A.J. Spurs, Addie Street, Apple Farm, Black Chaps, Boutique, Cliffs, DRI, Fernwood, Construction, the John and Carole King Family Trust, Los Lobos, Mission Grove, Montalban, the Robin L. Rossi Living Trust, Spanish Vineyards, Sycamore, SeaVenture, and The Vineyards at Spanish Springs, jointly and severally, for the following:

1. All actual damages suffered as a result of this fraudulent scheme, in an amount

65

no less than $21 million, which amount grows daily due to the applicable interest;

2. Exemplary and punitive damages;

3. Treble damages pursuant to 18 U.S.C. § 1964(c);

4. Attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c);

5. Pre-and post-judgment interest;

6. Equitable relief pursuant to 18 U.S.C. § 1964(a), including:

   a. Imposition of a constructive trust over all real and personal property obtained or maintained through the Enterprise;

   b. Appointment of a receiver to identify, manage, and preserve such assets pending judgment;

   c. Entry of an injunction restraining Defendants and those acting in concert with them from transferring or encumbering such assets; and

   d. An accounting of all funds received or transferred among the Complicit Entities;

7. Granting such other and further relief as this Court may deem just and proper.

Dated: December 17, 2025                    BAKER MCKENZIE LLP


                                            By: /s/ Nicholas O. Kennedy
                                            Nicholas O. Kennedy

                                            MANASSERIAN LAW, APC
                                            Armen Manasserian

                                            Attorneys for Plaintiffs,
                                            Coronitas Holdings, LLC, and
                                            Wolverine Endeavors VIII, LLC

66

# **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Dated: December 17, 2025          BAKER MCKENZIE LLP


By: */s/ Nicholas O. Kennedy*
Nicholas O. Kennedy

MANASSERIAN LAW, APC
Armen Manasserian

Attorneys for Plaintiffs,
Coronitas Holdings, LLC, and
Wolverine Endeavors VIII, LLC

67

Case No.
COMPLAINT